UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ARTHUR D'AMARIO, III | ) | |
| | ) | |
| v. | ) | C.A. No. 01-0097T<br>(N.H. No. 01-0069-JD) |
| | ) | |
| UNITED STATES OF AMERICA | ) | |

MOTION TO VACATE JUDGMENT

Petitioner hereby moves to vacate the Judgment entered on or about May 17, 2001, and to assign the matter for trial of the merits, pursuant to F.R.Civ.P. 60(b)(4), for the reason that,

(1) Judge DiClerico concealed bias and a conflict of interest that, under 28 U.S.C. § 455(a), mandated his recusal prior to entry of Judgment for Respondent;

(2) The prescribed remedy is vacatur of Judgment; and

(3) Relief is attainable for the first time under Rule 60(b) by virtue of Gonzalez v. Crosby, 125 S.Ct. 2641 (U.S. 2005).

For further support of this motion, Petitioner refers the court to his accompanying memorandum of law and affixed exhibits.

PETITIONER, pro se,

10-5-05

Arthur D'Amario III 02989070
U.S. Medical Center
PO Box 4000
Springfield, MO 65801-4000

CERTIFICATION

I certify that on Oct. 6, 2005, I mailed copies of this Motion and Memorandum to AUSA Adi Goldstein, 50 Kennedy Plaza, Prov., RI 02903.

petitioner, pro se

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ARTHUR D'AMARIO, III | § | |
| | § | |
| v. | § | C.A. No. 01-0097T (N.H. No. 1-0069-JD) |
| | § | |
| UNITED STATES | § | |

MEMORANDUM OF LAW SUPPORTING PETITIONER'S
MOTION TO VACATE JUDGMENT UNDER RULE 60(b)

This § 2255 proceeding was dismissed without hearing on or about May 17, 2001, by Judge DiClerico. A few days later, on May 24, Petitioner was indicted in Newark, NJ, for allegedly plotting to murder Judge DiClerico as soon as he was discharged from prison. The attached U.S. Marshals' logs, not acquired by Petitioner until Oct. 3, 2005, establish that as far back as July 2000 Judge DiClerico knew Petitioner would be indicted and that he employed his Marshals and FBI agents to keep Petitioner from "slip[ping] thru[sic] the cracks." USMS Log of Jan. 30, 2001. None of this activity was divulged to Petitioner by the court during pendency of the § 2255 motion.

A procedural argument under Rule 60(b) challenging the conduct of a postconviction trial, rather than the merit of the sentence and conviction, is not a new "claim" within § 2244(b) and leave to file is not required. Gonzalez v. Crosby, 125 S.Ct. 2641 (U.S. 2005).

Rule 60(b)(4) is not subject to any time limitations. Orner v. Shalala, 30 F.3d 1307, 1310 (10th Cir. 1994). Logic compels the conclusion that,

> "the mere passage of time cannot convert an absolutely void judgment into a valid one. This is one reason for our having held that there is no time limit on Rule 60(b)(4) motions, and that the doctrine of laches has no effect."

Jackson v. Fie Corp., 302 F.3d 515, 523 (5th Cir. 2002) (footnote omitted).

A lack of notice of a party that her liability for attorney fees would be redetermined rendered the judgment void. Orner, ibid:

> "This court has indicated on a number of occaisions that a judgment may be void for purposes of Rule 60(b)(4) if entered in a manner inconsistent with due process." Orner, supra, 30 F.3d at 1310.

"An unconstitutionally rendered judgment is void within the meaning of Rule 60(b)(4)." Colunga v. Young, 722 F.Supp. 1479, 1492 (W.D.Mich. 1989), aff'd, 914 F.2d 255 (6th Cir. 1990).

Petitioner argues that Judge DiClerico's participation with USMS and FBI in a criminal prosecution to maintain his custody mandated his disqualification in July 2000 under 28 U.S.C. § 455(a), and that the court acted in a manner contrary to due process in adjudicating the § 2255 motion so that it is a void judgment.

There is no discretion in reviewing a Rule 60(b)(4) motion; the judgment is either void or it is not. Jackson, supra, 302 F.3d at 522. "First, a void judgment is no judgment at all and is without legal effect." Jordan v. Gilligan, 500 F.2d 701, 710 (6th Cir.), cert. denied, 421 U.S. 991 (1974).

Where the facts tended to show bias, a judge's failure to recuse was a violation of § 455(a), even where the judge had forgotten about the facts at issue. Liljeberg v. Health Servs. Corp., 486 U.S. 847, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (finding that vacatur of judgment was the proper remedy); cf. U.S. v. Liffiton, 933 F.Supp. 226, 229 (W.D.N.Y. 1996) (Liljeberg inapplicable where allegedly biased judge had recused himself from petitioner's case).

Attached is a letter written April 30, 2003, by AFPD Lori M. Koch. She reports CUSPO Weiner telling her that federal judges "don't want" Petitioner in Rhode Island because of a June 2000 "threat." Obviously, Judge DiClerico sensed that the best way to appease his colleagues was to deny Petitioner fair and normal procedure in his § 2255 cause.*

*AUSA Browne answered the postconviction motion by conceding that several claims including ineffective assistance were fact-intensive and would require hearing. See, e.g., U.S. v. Martins, 413 F.3d 139, 155 (1st Cir. 2005) (ineffectiveness claims are fact-specific). In denying a hearing, the conflicted Judge DiClerico was ultimately contradicted by Judge Irenas, who at sentencing in Camden on April 9, 2002, made a finding that Ed Roy committed legal malpractice in arranging consecutive sentences not intended by either jurisdiction. On 4/28/00, Judge DiClerico authorized Roy to be paid 200% of his ACJA allowance as a reward for neglect and malfeasance. Roy now says he's been promised a RI judgeship.

Convictions were reversed due to the bias of a sentencing judge in U.S. v. Antar, 71 F.3d 97 (3d Cir. 1995).

When a judge failed to recuse even though her impartiality could reasonably be questioned, defendant's sentence was reversed. U.S. v. Jordan, 49 F.3d 152 (5th Cir. 1995).

Where a judge should have recused from an action under FTCA based on an appearance of partiality, the appropriate remedy was to reverse the judgment and remand for retrial. Preston v. U.S., 923 F.2d 731 (9th Cir. 1991); see also U.S. v. Mangini, 314 F.3d 1158 (9th Cir. 2003) (new trial ordered following breach of duty to recuse).

A mandamus petition to disqualify all district judges was granted, and Circuit justices also recused, where defendant was accused of conspiring to blow up the federal courthouse in Chicago. In re Nettles, 394 F.3d 1001, 1003 (7th Cir. 2005) ("The issue is appearances.").

The affixed USMS log of May 21, 2001, states that Petitioner was indicted May 18 for threatening Judge DiClerico. The judge knew he had to beat the indictment in hastily dismissing the § 2255 motion otherwise the fact of the indictment would disqualify him and Petitioner might get a fair hearing in an impartial courtroom before someone else.

In a similar circumstance, a judge disqualified himself from hearing defendant's § 2255 postconviction motions concerning his sentence, where he had expressed intentions to murder the judge. U.S. v. Cerrella, 529 F.Supp. 1373 (S.D.Fla. 1982). The judge had been placed under protection and given security by USMS. Id. at 1375:

> "Beyond all legal argument, beyond all case precedent, a reasonable person in the street, faced with a judge sitting on postconviction matters that could free from incarceration a man who has put out a "contract" on the judge, would have to harbor doubts as to the judge's impartiality." Id. at 1382.

In testing for bias, there is a distinction between what a judge learned from her participation in the instant case, and what she learned "from an extrajudicial source[.]" U.S. v. Gordon, 634 F.2d 639, 641 (1st Cir. 1980). The USMS logs show that Judge DiClerico relied on extrajudicial contacts in his chambers from July 2000 throughout 2001.

With a judge's awareness, the FBI was investigating a defendant in a conspiracy to murder the judge or his family, which influenced the sentencing hearing that had been expedited. U.S. v. Greenspan, 26 F.3d 1001, 1005 (10th Cir. 1994). The judge learned of the conspiracy from the FBI. Id. at 1006. There was no indication the plot was a ploy, so recusal was mandated. Id. at 1006 (remanded for resentencing before a different judge):

> "Here, by contrast, the defendant did not communicate the death threat to the judge, nor is there any suggestion that the defendant ever intended the judge to learn of the threat before it was actually carried out. Thus, there is nothing here to suggest that the defendant was using the threat as a device to force a recusal." Id. at 1006:
>
> "The judge obviously took the threat very seriously, and chose to accelerate court procedures in order to reduce the risk to him and his family as he perceived it." Id. at 1007.

Therefore, a threat characterized as an extrajudicial source has a higher potential for generating a situation where a judge's impartiality might reasonably be questioned than would be the case if the incident arose during the course of the proceedings themselves. Liteky v. U.S., 114 S.Ct. 1147, 127 L.Ed.2d 474 (U.S. 1994).

Petitioner doubts that Judge DiClerico was ever impartial. Judge DiClerico validated a joke search warrant in which the "crime" described in Sgt. Collins' libelous Affidavit was committed by . . . Sgt. Collins. The typeset on the anonymous greeting cards matches Lt. Bussiere's typewriter at Attleboro Police Dept. The DNA beneath the stamps belongs to a police officer, but this court has no desire to search for the truth. But see Osborne v. DA's Office, 77 Cr.L.Rptr. 593 (9th Cir. Sept. 8, 2005) (allowing prisoner to bring § 1983 action for DNA testing of evidence).

Delivering a peculiar brand of New Hampshire-style "justice," Judge DiClerico ruled on Nov. 3, 1999, that Petitioner's legally purchased firearm, buried under clothes inside a bedroom dresser, was in "plain view." In a factually identical case, a felon's handgun, hidden beneath a pile of clothes in a bedroom and seized without a warrant, was not in plain

view and had to be suppressed. U.S. v. Paradis, 351 F.3d 21, 30-32 (1st Cir. 2003) (felon had "protectible Fourth Amendment interest" in concealed firearm). This is exactly the issue argued by Petitioner to no avail from 1999-2004.

Judge DiClerico upheld the conduct of marauding police in seizing alleged contraband completely unrelated to the mythical "crime" under investigation: crank love letters mailed to Debra Sellers by a RI cop. But in U.S. v. Cardiges, 881 F.Supp. 717, 724 (D.N.H. 1995), the same Judge DiClerico wrote that evidence not described in a valid warrant may be seized if it has a "nexus with the crime under investigation." Here, the firearm and irrelevant Smith Corona typewriter had no nexus. "The Fourth Amendment prohibits general searches." Id. at 722. Yet even after the police raiders seized the irrelevant typewriter on their pretextual warrant, Judge DiClerico allowed them to ransack the entire apartment, ostensibly looking for "computer components." A Smithfield Police Dept. report of Capt. Gregg L. Catlow dated Feb. 12, 1999, and introduced by Petitioner as an exhibit on Dec. 21, 1999, recorded the fact that prior to the raid police knew the greeting cards were produced by a typewriter, not a computer. The great raid was just a frame-up, and Judge DiClerico's role was to run cover for the nihilists.

Ed Roy was incompetent. Judge Irenas agrees with Petitioner, and the NJ public defender wants to serve as an expert witness against him. Judge Irenas was objective and impartial; Judge DiClerico was a fraud.

CONCLUSION

This § 2255 motion swears that police typed the crank letters and Ed Roy was ineffective in failing to prove it. Petitioner has the right under statute to an evidentiary hearing, before a different, impartial judge upon reopening of Judgment through Rule 60(b)(4) and § 455(a).

PETITIONER, PRO SE,
[signature]
Arthur D'Amario, III

cc:
AUSA Adi Goldstein
50 Kennedy Plaza
Prov., RI 02903

**FEDERAL PUBLIC DEFENDER**
**DISTRICT OF NEW JERSEY**
800-840 COOPER STREET, SUITE 350
CAMDEN, NEW JERSEY 08102

**RICHARD COUGHLIN**
FEDERAL PUBLIC DEFENDER

**CHESTER M. KELLER**
FIRST ASSISTANT

(856) 757-5341 Telephone
(856) 757-5273 Facsimile

April 30, 2003

Barry Wiener
Chief U.S. Probation Officer
Office of the United States Probation
District of Rhode Island
36 Exchange Terrace - 3rd Floor
Providence, Rhode Island 02903

Re: United States v. Arthur D'Amario
Criminal No. 01-346 (JEI)
Criminal No. 99-030 (JAD)

Dear Mr. Wiener:

This is to document that on Thursday, April 24, 2003 you advised me during our telephone conversation that you were of the understanding that Mr. D'Amario's brother, Jeffrey D'Amario, would not permit his brother Arthur to reside with him at his home in Smithfield. You further stated you understood that Jeffrey D'Amario was "afraid" of his brother. You did not provide a source for either of these statements.

On that same date I spoke to Jeffery D'Amario. He advised that he had never been contacted by anyone, including the probation department, related to his brother Arthur staying with him other than Arthur himself. He further advised that he is not "afraid" of his brother, has never told anyone that he is, and that he is willing to allow Arthur to stay with him until he finds a more permanent home. His only concern is that his house is small and he would not want this to be a permanent arrangement.

You also advised me that a number of judges (without providing names) and Assistant United States Attorney Stephanie Brown are "afraid" of Mr. D'Amario based on what they consider to be threats contained in his June 2000 letter, and therefore that the District of Rhode Island does not "want" Mr. D'Amario in that District.

Please do not hesitate to contract me, preferably in writing, if you feel I have misconstrued our conversation in any way.

Sincerely,

Lori Koch

Lori M. Koch
Assistant Federal Public Defender

LMK/a

cc: Professor Andrew Horwitz, Esquire
Arthur D'Amario

June 28, 2000

Received a telephone message from Supervisor Richard Cooper re: a possible threat against Judge DiClerico. Cooper received a telephone call from the marshals' office in Rhode Island. Cooper was at USMS headquarters and was passing on the message for action here.

Deputy US Marshal Clifton Moore was contacted and message left. Moore returned the call and left the message that DUSM Mike Wattik [redacted] was handling the threat. Wattik was called and a message was left. Wattik called back about 3:30 P.M. and relied the following information. The US Attorneys office for the District of Rhode Island had received a letter from Attorney Edward Roy, attorney for D'AMARIO, Arthur. **Assistant US Attorney Stephanie Browne** stated that in her cover letter that D'AMARIO had threaten Judge DiClerico, as well as US District Judge Lagueux. Wattik further stated that D'AMARIO was in FCI Fort Dix, Fort Dix, NJ. And D'AMARIO's release date was set for July 4, 2001. Any change in that status security for Fort Dix would notify Wattik. A copy of the threat letter and cover letter was faxed to this office. A discussion was had with Assistant US Attorney Stephanie Brown, Brown stated that the letter has been turned over to SA Nick Murphy FB[redacted] Brown also stated that she has spoken with an assistant that is handling a motion for release from D'AMARIO to the 3th circuit. Based on the overt violence stated in the letter, which according to Brown is a change for D'AMARIO, the warden for Fort Dix moved D'AMARIO in protective custody. Also the warden would notify the Marshals Service if any change in D'AMARIO's status.

Judge DiClerico's chambers were contacted and informed of the threat. The judge is out of the country till Monday, July 3th. A message was left to have the judge get in touch with this office as soon as possible.

Court Security Inspector Henry Ohrenburger was notified by telephone. A 550 would be done as soon as a copy of the Rhode Island was received. Chief Gary DiMartino was notified.

June 29/30

Spoke to Wattik from RI decided that only one 550 would be submitted by Wattik with secondary notice to this office. D'AMARIO was placed on suicide watch by BOP based on threats against himself in the letter. See attached email from Wattik.

Supervisor SA Nick Murphy called back and stated that SA **Chad Johnson** [redacted] would be assigned to the case.

GOVERNMENT EXHIBIT SBJ-2

July 3th

Chief relied that he spoke to Judge DiClerico about D'AMARIO and his status. Received letters from Wattik with 550, picture and cover threat notice. Received voice mail from U. S. Attorney Craig Moore that he has assigned case to AUSA Terrance Donnelly. [redacted]

Received call from Wattik that BOP moved D'AMARIO without notifying USMS, D'AMARIO now in FMC Rochester. **FMC Rochester 2110 East Center Street Rochester, MN 55904 (507) 287-0674, fax (507) 287-9600.** Wattik stated that he refiled a notice with BOP on D'AMARIO for movement. BOP move D'AMARIO for safety reasons and for a study of his mental healt[redacted].

July 17th

Received copy of mental health request from FCI Ft. Dix to FMC Rochester from Wattik. Ft. Dix feels like D'AMARIO has been going downhill and needs more help then Ft. Dix can provide.

July 27th

Received voice mail from Terrance Donnelly[redacted]. Donnelly will keep track of it and keep us informed [redacted].

August 2, 2000 / 09:51

While on assignment received voice mail from Wattik that BOP has decided that D'AMARIO's state jail time counts and that he D'AMARIO is to be released. BOP is going to fly D'AMARIO to Providence, RI on a commercial flight and release him today. I received this voice mail at 10:05 or so and called the office left voice for Cooper and the spoke to the Chief to be sure someone got the message right away. Chief stated that he would speak to Wattik and go from there.

Spoke to the Chief late in the afternoon he had spoke to Wattik and, Donnelly. Donnelly took hold of the matter and ensured that D'AMARIO was not released and that the state time did not count toward his sentence computation.

August 11, 2000

Called Donnelly to get an update on the case, left a message. Called Wattik for update nothing new D'AMARIO still in Rochester.

August 14, 2000

Received call from AUSA Terrance Donnelly re: D'AMARIO. D'AMARIO is still in Rochester [redacted]

October 2000

Called AUSA Terrance Donnelly re: D'AMARIO for an update of case. Donnelly called D/NJ for a case update and was told that the assistant was tied up in trial but would likely indict D'AMARIO after the trial ends [redacted]

November 21, 2000

Received a cellphone call from Supervisor Richard Cooper that Judge DiClerico had received another letter from D'AMARIO and please update the case.

November 22, 2000

Reviewed two pieces of inappropriate communication from D'AMARIO from the judges' chambers. One dated November 7th and the other dated November 15th. Spoke to AUSA Terrance Donnelly updated him with the two pieces of communication. Donnelly gave D/NJ AUSA Debra Goldklang [redacted] Called Goldklang and left a message to called either Rick Cooper or myself re: the new letters, also for an update of the status of the indictment. Called Threat desk spoke to Ruddy Friedrich with new communications, requested an 11 and copies fax to him. Done.

[redacted].

January 30, 2001

Per the Chief called D/NJ AUSA Debra Goldklang [redacted] re: status of case. Chief is meeting with Judge DiClerico, and needed an update. Debra not in [redacted]

[redacted] After talking with him we will request the D'AMARIO should be indicted in April, so he does not slip thru the cracks.

[redacted]

Received call from Mike Wattik that D'AMARIO's release date had been moved to late May.

May 21, 2001

Received fax from US Attorney's Office NJ, D'AMARIO was indicted on May 18, 2001. Received a copy of the indictment and cover sheet.

May 23, 2001

Notified by CDUSM Gary DiMartino that D'AMARIO would be turned over to the USMS and FBI on May 24, 2001, for arraignment and removal to D/NJ to face his indictment. D'AMARIO ordered detained and warrant of removal issued.

May 29, 2001

Received a copy of a letter from D'AMARIO to DiClerico dated May 21, 2001. DiClerico received the letter at his chambers on the 25th of May. The Chief requested a 550 to HQ on this letter. [redacted]. Typed up a 550 on the letter and faxed out to Rudy at [redacted] The letter does not threaten DiClerico but does mention the new court case in Newark.

August 2001

Received briefing from the Chief that D'AMARIO would be released pending trial. D'AMARIO's parents would cosign the bond and he would live with them in Arizona, and be on 24 hour electronic monitoring.