UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

ARTHUR D'AMARIO III :
:
:
v. : C.A. No. 01-0097
:
:
UNITED STATES :

MOTION FOR RELIEF FROM JUDGMENT

Petitioner moves for relief from the judgment entered May 23, 2001, and for hearing on his claims of ineffective assistance and violation of the Fourth Amendment, pursuant to F.R.Civ.P. 60(b)(4, 6), for the reasons expressed in his accompanying memorandum.

PETITIONER, pro se,

[signature] 4-28-08

Arthur D'Amario III
FCI Englewood #02989070
9595 W. Quincy Ave.
Littleton, CO 80123

CERTIFICATION

I certify that on ~~April 24~~ MAY 14, 2008, I mailed a copy of this Motion & Memorandum to AUSA Adi Goldstein, 50 Kennedy Plaza, Prov., RI 02903.

[signature]

UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ARTHUR D'AMARIO III | : | |
| | : | |
| v. | : | C.A. No. 01-0097 |
| | : | |
| UNITED STATES | : | |

MEMORANDUM SUPPORTING PETITIONER'S
MOTION FOR RELIEF FROM JUDGMENT

Relying on 45 exhibits, Petitioner is moving under Rule 60(b), clauses (4) and (6), to reopen this § 2255 proceeding and for an evidentiary hearing on his claims that Ed Roy rendered ineffective assistance at the suppression hearing and police violated the Fourth Amendment. Petitioner may utilize Rule 60 for he complains of "some defect in the integrity of the [instant] federal habeas proceedings." Gonzalez v. Crosby, 545 U.S. 524, 532 (2005).

Evidence procured by Petitioner throughout 2007 and '08, primarily with FOIA and the RI Access to Public Records Act, fully supports (a) the bonafide claims pleaded in this initial § 2255 petition; and (b) the allegation he made in his Oct. '05 "motion to vacate judgment" that Judge DiClerico was biased. Typically, he was given no opportunity to prove it. Evaluation of a judge's impartiality tends to be fact-specific. Logue v. Dore, 103 F.3d 1040, 1045 (1st Cir. 1997) (stating that bias or partiality are "flatly prohibited").

*This newly available evidence, particularly Exhibits Nos. 29, 30, 31, 32-37, and 38-44, go beyond the conflicted Judge DiClerico to reveal that:

(a) Judge Lagueux committed a major crime against Petitioner in D'Amario v. Russo, No. 89-cv-0011L (D.R.I.) [718 F.Supp. at 120], by removing his pro se § 1985(2) complaint and replacing it with an old Superior Court photocopy of a tort claim (thereby proving unnatural and grotesque bias already existing ten years before Petitioner's arraignment on this indictment). (EXs 29-31.)

*Clause (2) of Rule 60 is innappplicable, nor are these new claims requiring leave from the Circuit. § 2244(b). This evidence was always known to Petitioner, or the facts were, but 2008 is the first time he's possessed it all together. Dozens of USMS and BOP transfers from '99 to '07 kept separating him from his legal papers, which were usually shipped home or thrown away by the government. The USMS logs were retrieved in 2007-08 through FOIA.

(b) Judge DiClerico acquired Petitioner's Fort Dix "threat" letter in July 2000 from extra-judicial sources, began secretly working with DUSM Steve Bartlett and AUSA Debra Goldklang to maintain Petitioner's custody and to convict him in NJ, and feigned ignorance to remain in the case.

(c) Aware that in March '01 AUSA Browne answered this § 2255 petition by conceding that Petitioner is entitled to "further proceedings" on his fact-dependent claims of ineffective assistance and Fourth Amendment violation, Judge DiClerico denied fair procedure by hastily dismissing the action on May 17, 2001 (EXs 36 & 36A). The conflicted, biased judge knew Petitioner was to be indicted in NJ, with the judge named as "victim," the very next day, May 18 (EX 37). Judge DiClerico did not want to have to recuse and risk the possibility that an impartial replacement judge would hear the claims, overturn the conviction, and let Petitioner out of jail.

(d) The Fort Dix "threat" letter was leaked to the First Circuit in July 2000 by AUSA Lockhart. Rather than recuse, Chief Judge Boudin pretended to be unaffected and personally rejected 100% of Petitioner's criminal and habeas appeals from 2001-08. A year ago, using FOIA, Petitioner obtained various Marshals' logs and fax cover sheets proving that Judge Boudin was illegally divulging Petitioner's "confidential" Judicial Council submissions to AUSA Goldklang in the hope she could use them to convict or have his NJ bail revoked (EXs 38-43). When Petitioner became suspicious, Judge Boudin lied that he'd never received the Judicial Council complaints, and had no knowledge how prosecutors acquired them (EX 44). The Chief Judge is a liar.

The entire Circuit is infested with hateful corruption and dishonesty. It is no wonder that Ed Roy - a RI State Police lawyer in '99 - laid down and made Petitioner the patsy for the anonymous letters amateurish frame-up. (When "AUSA" Roy disclosed Petitioner's attorney-client communications to FBI on 6/27/00, he advised the A-I-C to charge Petitioner with threatening Judge Lagueux, not DiClerico. Later it was learned that on 6/27/00, AUSA Roy was seeking a money-damages judgment from Lagueux, in Menebhi v. Mattos, 183 F.Supp.2d 490 (D.R.I. 2002) (claim filed February 2000).)

Lagueux's conduct of obstructing justice by criminal means in Russo, supra, represents that Petitioner was effectively banished from this corrupt court by 1989.* Venue was improper, a point Ed Roy was afraid to press in '99. Every order entered by Judge DiClerico is a legal nullity. Breach of the duty to recuse codified in 28 U.S.C. § 455(a) requires vacatur of judgment.

*Another kangaroo court, the First Circuit, resorted to the laughable excuse that its Judicial Council was without jurisdiction to investigate Lagueux as his crime was "directly related to the merits." On 3/5/99, Magistrate Martin - another imposter - detained Petitioner as a "risk of flight" on the canard that he'd failed to appear for a misdemeanor pretrial conference in Superior Court in Sept. '86. Martin was aware that Case Scheduling had mailed the '86 notice to attorney John G. Hines, when Petitioner's attorney was John H. Hines. Martin disregarded Petitioner's request that the state file and defective notice be summoned to validate his account of the "mistake." (In reality, the wrong attorney Hines was noticed deliberately when the A.G. tried to sabotage Petitioner's bail.)

Liljeberg v. Health Acquisition Services Corp., 486 U.S. 847 (1988); U.S. v. Antar, 53 F.3d 568 (3d Cir. 1995); U.S. v. Jordan, 49 F.3d 152 (5th Cir. 1995).

Where a judge hears of a threat from extra-judicial sources and steps are taken by USMS and FBI to place him under protection from a party, § 455(a) obligates him to recuse. U.S. v. Cerrella, 529 F.Supp. 1373, 1382 (S.D.Fla. 1982) (postconviction case); U.S. v. Greenspan, 26 F.3d 1001 (10th Cir. 1994).

Recusal of the entire Circuit was actually compelled prior to trial by § 455(b)(1), as Judge Lagueux's crime indicates personal bias.

The denial of impropriety in the face of overwhelming evidence of ex parte contact is very serious. Committee on Judicial Conduct & Disability, 517 F.3d 558, 562 (U.S.Jud.Conf. 2008).

A judgment is obtained by fraud in a judicial system that doesn't provide impartial tribunals or procedures compatible with due process. U.S. v. Small, 333 F.3d 425, 428 (3d Cir. 2003), rev'd on other grounds, 544 U.S. 385 (2005). "An unconstitutionally rendered judgment is void within the meaning of Rule 60(b)(4)." Colunga v. Young, 722 F.Supp. 1479, 1492 (W.D.Mich. 1989), aff'd, 914 F.2d 255 (6th Cir. 1990). Rule 60(b)(4) is not subject to any time limitations. Orner v. Shalala, 30 F.3d 1307, 1310 (10th Cir. 1994).

Judge DiClerico acted in a manner inconsistent with due process when he breached a duty to recuse so he could hastily and unfairly dismiss this case on 5/17/01 because he knew he'd become a prosecution witness on 5/18/01.

With respect to Rule 60(b)(6), the only time requirement is reasonableness, and clause (6) attaches to "extraordinary situation[s]." Klapprott v. U.S., 335 U.S. 601, 613 (1948). It is an extraordinary circumstance that,

1) Petitioner had no meaningful legal representation as Ed Roy hated him, was conflicted, and performed incompetently at the Franks hearing;

2) The evidence (firearm and ammunition) was inadmissible under the Fourth Amendment, as the warrant's executing officers committed the crime described in their affidavit and procured it through judicial deception;

3) Judge DeRobbio, who issued a grossly overbroad search warrant, was not neutral and detached, as he'd been overheard cursing Petitioner 8/30/95;

4) Petitioner pleaded valid and potentially meritorious claims in 2001 but was denied fair procedure by a biased Judge DiClerico (thereby triggering the rule of Crosby, supra, 545 U.S. at 532, that he may invoke Rule 60(b) to reopen the original proceeding without presenting a new "claim");

5) The effect of cumulative errors by the court and Roy, as demonstrated by the exhibits, has resulted in the case having been wrongly decided.

AN EXAMINATION OF THE EVIDENCE
THAT JUDGE DICLERICO AVOIDED

I. JUDGE DEROBBIO WAS NOT A NEUTRAL AND DETACHED ISSUING OFFICER.

The Fourth Amendment demands "neutral and detached" quality in one issuing a warrant. Johnson v. U.S., 333 U.S. 10, 14 (1948). The judge must be disinterested. U.S. v. Young, 877 F.2d 1099, 1104 (1st Cir. 1989). He must act independently of the police or prosecution. Shadwick v. Tampa, 407 U.S. 345, 351 (1972). He must not function as a rubber stamp for police. U.S. v. Servance, 394 F.3d 222, 231 (4th Cir. 2005). He must be able to gauge the existence of probable cause by an objective standard. Logue, supra, 103 F.3d at 1044. The good-faith exception to the exclusionary rule is inapplicable where the judge abandons his role and fails to act in a neutral and detached manner. U.S. v. Johnson, 78 F.3d 1258, 1261 (8th Cir.), cert. denied, 519 U.S. 889 (1996).

On 2/8/99, the Garrahy Judicial Complex was filled with dozens of judges and justices of the peace. How convenient for police that Judge DeRobbio chose to review the joke warrant application of Sgt. Collins and Capt. Catlow.

As Petitioner has complained of before - with no opportunity to prove it - an incident occurred at the Powers Building on 8/30/95 which disqualified Judge DeRobbio from consideration of the joke warrant application:

> The JNC held a public hearing 8/30/95 to select a list of 5 finalists to fill a vacancy on the RI Supreme Court. Candidates included attorney Lauren E. Jones and Superior Court Judge Richard J. Israel. Petitioner arrived and signed his name on the list of public speakers, then sat down next to attorneys Norman E. D'Andrea and now-Mayor of Providence David N. Cicilline. Jones was seated behind a group of judges in a different area. As Petitioner signed on, Jones overheard Judges Needham, DeRobbio and Israel, and Administrator John Barrette, cursing Petitioner. Barrette said to the judges, "Arthur D'Amario's here to 'bang' a judge." (Jones related this to Petitioner in the Supreme Court clerk's office 3/7/96.) At that moment, Judges Needham and DeRobbio left their seats and sat down beside Petitioner where Cicilline had been, which Petitioner understood to be an act of intimidation. The JNC called a recess before Petitioner spoke. During the recess, Judge Israel approached Petitioner in a hallway, and apologized for having dismissed a postconviction case, D'AMARIO v. STATE, No. PM 88-4430, a month earlier. Israel said he'd decided the case wrongly and was impressed by Petitioner's performance during trial. Petitioner understood Israel was trying to persuade him to exit the building. Instead, Petitioner stayed and made a speech advocating Jones for the Supreme Court. He was recorded by JNC as public speaker #29. Judge DeRobbio, speaker #6, advocated his lifelong friend, Judge Israel (EX 3). The JNC rejected Israel, and added Jones - Petitioner's favored candidate - to the Final Five list (EX 3). Petitioner's next court appearance was 3/7/96, whereupon Judge Israel, sua sponte, banished him from ever filing "any" pleading in "any" RI court. Israel made no findings, held no hearing, and denied Petitioner leave to appeal the order. Ed Roy was apprised of the JNC incident in Feb. '99 by Petitioner, expressed initial interest in using it to invalidate the search warrant, but never pursued it.

On 12/4/07, Lauren Jones wrote to partially corroborate Petitioner (EX 1). For 9 years, JNC ignored all of Petitioner's public records act requests for its minutes, and RI Attorney General would not process his APRA complaints.

But in Feb. '08, for the first time, the Attorney General acted on the newest complaint and convinced JNC to disclose the 8/30/95 minutes (EX 2). Therefore, this evidence was known to Petitioner in 1999 but unavailable 'til '08.

The JNC minutes and Jones letter are evidentiary support for Petitioner's 2001 claim in this initial § 2255 motion that the Fourth Amendment was violated by Judge DeRobbio's participation. Clearly, Judge DiClerico was in error to hastily dismiss this valid claim without providing Petitioner an opportunity to gather and present proof. The newly available evidence calls for relief pursuant to Rule 60(b)(6).

Another indication that Judge DeRobbio was intent on nailing Petitioner is that he did in fact rubber-stamp the warrant (EX 4). Sgt. Collins tried to be evasive and confusing as to whether the anonymous cards were produced on a typewriter or computer (EX 15), so the judge granted his every wish to maneuver him into small spaces within the apartment. Why were police authorized to search for computer components and hard drives incompatible with a conventional typewriter? Like Judge Israel's bizarre sanctions imposed on 3/7/96, the grant of the warrant by Judge DeRobbio on 2/8/99 was vindictive harassment in retaliation for Petitioner's JNC speech of 8/30/95.

## II. JUDGE ISRAEL MAY HAVE AUTHORED THE ANONYMOUS CARDS.

In private conversation, any RI lawyer will admit that Judge Israel is mentally ill. A Providence Journal article circa 1980-81 quoted Israel as saying his favorite hobby is reading and writing poetry.

The crank greeting cards were not silly, childish limericks, but rather clever, witty poetry (EX 15).

On 8/8/98, the Journal published Petitioner's letter to the editor which poked fun at Judge Jeremiah's ethics scandal (EX 5). Only a month later, Debra Sellers began getting weird, crank letters from RI.* On 9/3/98, the Journal published an article reporting that Sellers had a no-contact order.+

The 8/8/98 letter (EX 5) provided more incentive for the judges to frame

*There are actually at least 3 anonymous letters, but only 2 identified in EX 15. In Sept. '98, Sellers, or Attleboro police, received one saying: "Ha-ha! You'll never catch me. I'll make the Commonwealth pay every dime to get me back to Mass." This forgery was quoted by Asst. DA Chris Markey in his 1/11/99 statement to the MA Bd. of Bar Overseers, but not produced. Markey had mentioned it to Judge Phillips 11/5/98 at an arraignment. No one has ever seen it.

+For 9 years, for reasons unknown, the Journal library has refused to sell a copy of its 9/3/98 article to Petitioner. In early 2005, reporter Tom Mooney claimed to have investigated these crank letters, told Petitioner he's guilty, and then laughed at and insulted him over the phone.

Petitioner with anonymous letters, and the 9/3/98 article alerted them to the fact of his vulnerability. Judge DeRobbio should be questioned as to whether he read the 9/3/98 article in the newspaper prior to 2/8/99.

If Judge Israel wrote the crank letters and gave them to police to deliver to Sellers, it would explain why Ed Roy acted against Petitioner's interests, and why no one has ever seen the letters or why the courts will not permit fingerprint and DNA analyses.

## III. MARAUDING POLICE ALREADY KNEW PETITIONER OWNED A FIREARM.

Another unpleasant fact this illegitimate court cannot accept is that the joke warrant was pretextual. Police just wanted a phony excuse from a phony judiciary to forcibly enter Petitioner's apartment so they could find his gun and sabotage his state probation.

From the beginning, rich girl Debra Sellers was being coached by a RI State Police detective - a truth this court finds annoying. At an ex parte hearing in Attleboro 10/21/97, unaware she was being taped, Sellers testified, "A FRIEND OF MINE IS A DETECTIVE IN THE RI POLICE DEPT." (EX 6.) That cop told Sellers Petitioner owned a handgun. In her pro se Defendant Information Form submitted 10/21/97, Sellers wrote of Petitioner's access to firearms, "Posession[sic] of a handgun - years ago!" (EX 7.)

Police may not use a warrant to search for items outside of its scope. U.S. v. 1328 North Main Street, 634 F.Supp. 1069, 1075 (S.D.Ohio 1986).

Of course, this court sees nothing suspicious in the facts that Sellers was working for a state police detective who knew Petitioner had purchased a handgun "years ago." That's why all prior judgments are void. This court continues to be incapable of processing information.

Petitioner is entitled to subpoena Sellers' long-distance telephone records to identify that police detective who knew he owned a firearm.

## IV. SELLERS WAS KNOWN BY MARAUDING POLICE TO BE A LIAR.

A warrant can be invalidated on the basis of material omissions in the application process. U.S. v. Vigeant, 176 F.3d 565, 572 (1st Cir. 1999).

Debra Sellers is a habitual liar, and the executing officers knew it but did not disclose it when applying for their joke warrant.

In his libelous affidavit (EX 15), Sgt. Collins declared that Petitioner was "harassing" Sellers with phone calls and unwanted contact. In reality - not that this court is concerned with such a concept - Sellers was harassing Petitioner with a blizzard of false accusations, and police always knew it.*

Upon lying to obtain her civil order, Sellers' TRO was appealed by Petitioner, who was ordered by Judge Dolan to serve the pro se plaintiff a copy by certified mail (EX 8). Not surprisingly, the angry, bipolar rich girl filed a "contact" violation criminal complaint over the Notice of Appeal the minute she received it (EX 9). The warrant for an arrest was sought by Lt. Bussiere (EX 10). (Collins omitted this incident from his Affidavit.)

As with her ex parte testimony of 10/21/97 that her "friend" was a RI cop (EX 6), Sellers was unable to recognize on 10/31/97 that police were recording her words. Exhibiting her hostility and jealousy, she told them:

> "At this time Mrs. Sellers went on to tell [Ptlm.] DuFort that she had dated D'Amario, she said that this was approximately 18 months ago, she said that she only dated this subject twice and never had any problem, and hasn't seen him since. Mrs. Sellers went on to tell DuFort that she broke it off with him 18 months ago and hasn't heard from him until now." DuFort report (EX 9).

Just two days earlier, Sellers had testified that Petitioner was phoning her every night and "harassing" her in an unspecified way.

The fact that police sought a warrant over this basic Rule 5 mail service indicates a police/Sellers collaboration to frame Petitioner. Her no-contact order stated on its face in ¶2 that:

> "You are ordered not to contact the Plaintiff, except . . . for notification of court proceedings . . . Notification of court proceedings is permissible only by mail, or by sheriff or authorized officer when required by statute or [court] rule." M.G.L. c. 209A; EX 11 at p. 2, ¶6.

This outrageous, false arrest was dismissed at the first pretrial conference (EX 11, p. 4, ¶11). Petitioner hired a Boston lawyer and sued Lt. Bussiere, Ptlm. DuFort and Sgt. Collins (EXs 11, 12). He'd eventually settle for a sum of $5,000 (EX 12, DE #39). Collins omitted the arrest without probable cause induced by Sellers from his affidavit (EX 15).

RI Sen. Mike Flynn, sensing what was to come, tried to mediate a resolution to extricate Petitioner from a crooked court system. Flynn wrote a letter to Sellers 7/25/98 (EX 20). How did the rich girl react?

On 7/26/98, Sellers gave the Flynn letter to Sgt. Collins and filed a

*Sellers seemed to become enraged every time she found Petitioner dancing with other women in RI nightclubs, and realized she was not controlling his life. Arrests immediately followed these encounters. The RI clubs were close to where Petitioner lived, but a long trip for the wealthy Sellers.

criminal complaint with Attleboro Police accusing Petitioner of "forgery." The ever-vigilant Collins pretended to take it seriously, and embarrassed the Senator by pursuing a "forgery" investigation.

Collins omitted the "forgery" complaint from EX 15, too.

On 2/4/99, Sellers appeared in court to extend her no-contact order, and Lt. Bussiere attended. Cross-examined for the first time, Sellers testified that Petitioner hadn't phoned her in '99, or in '98, or in '97. She added that Bristol County DA Markey had brought false charges against Petitioner in 1998.

Neither Bussiere nor Collins divulged that testimony to Judge DeRobbio. By 2/8/99, both make-believe policemen knew Debra Sellers was a perjurer who was abusing judicial processes to ruin Petitioner's life in a jealous fit.

(This ridiculous court finds nothing remotely suspicious.)

V. <u>BUSSIERE AND COLLINS SEEK REVENGE FOR THE CIVIL SUIT</u>.

A constable served Bussiere, Collins and DuFort with Petitioner's civil summons on 7/28/98 (EX 12, DE #4). How did Bussiere take it?

The same day, 7/28/98, Lt. Bussiere typed and signed a request addressed to the Attleboro court clerk to inspect the Sellers file, No. 9734 RO 0752.* Obviously, he learned that her no-contact order was active. Second, if he didn't already know, he'd have seen EX 7 and discovered that Petitioner may still own a handgun purchased "years ago." Sellers would begin receiving anonymous letters with RI postmarks about a month later.

Police would strike after Sellers got their Happy Birthday card to her. They made plenty of mistakes. Sgt. Collins reported that "[t]oday," Jan. <u>15</u>, Sellers received the card by mail (EX 13), and for that reason Petitioner is a probation violator (EX 15). Lt. Bussiere and PO Jeff Wordell served Petitioner a summons to appear in court for a violation hearing (EX 14). Wordell typed on the summons: "DATE OF ISSUE 1/14/99." Incredibly, they issued a summons on Jan. <u>14</u> over a "crime" reported on Jan. <u>15</u>! This astounding evidence alone would crack the case if this was a legitimate court of law.

*In late '98, Petitioner made a copy of Bussiere's 7/28/98 request to inspect the civil file, which is in storage in RI. In 2002, he wrote to the clerk to ask for another copy of it. The clerk-magistrate, Dan Sullivan, wrote back lying that "there was no request for information filed in this matter, by Lt. Bussiere." Either Sullivan was lying to protect police, or else Bussiere had returned to remove and destroy the document to cover his tracks after the 2/8/99 raid on Petitioner's apartment.

VI. THE WARRANT WAS PROCURED BY JUDICIAL DECEPTION.

As previously stated, police tried to confuse Judge DeRobbio about whether the crank letters were produced on a typewriter or computer device. Seeing no contradiction or ambiguity, DeRobbio happily rubber-stamped the application (EX 4). Judge DiClerico, exposed now as a judicial fraud and a sneak, rescued the marauders by asserting that once they'd confiscated Petitioner's irrelevant Smith Corona, they had to continue the search for "computer hard drives" to exhaust the warrant. (Order of 11/3/99 denying Petitioner's motion to suppress, #CR 99-024.) Judge DiClerico is a faker who can't see straight - a biased, corrupt and dishonest fraud of a judge.

The confusion ends here, today. The mystery letters were typewritten, not computer generated, and marauding police knew it on 2/8/99.

The initial Incident Report of Sgt. Collins states that the letters were "addressed with a typewriter and typed[.]" (EX 13.)

Capt. Catlow's own report of 2/8/99 said Sgt. Collins told him Petitioner is "typing letters" to Sellers (EX 16). Collins told Catlow of a desire to seize a typewriter, not a computer (EX 16).

Disgraced ex-FBI document expert Alan Robillard would find the letters were typed (EX 17), and not from a Smith Corona.

On 5/18/99, Robillard met with "AUSA" Ed Roy - the State Police lawyer. Roy's internal memo of 5/20/99 quotes Robillard as telling him that,

> "Collins was concerned chiefly with typewriting and in fact had identified the card as having typewriting on it. He did not mention a computer or bubblejet printer type of printing. He was concerned with typewriting." (EX 18.)

Roy did not bring that out on his direct questioning of Robillard 10/21/99.

The anonymous letters were typed. Even if by some stretch of the imagination probable cause existed to apply for a warrant, then the scope of the warrant had to be limited to seizure of the Smith Corona. On 10/21/99, Sgt. Collins testified that his pressed and intrusive search of the bedroom closet and dresser drawers for "15 minutes" after seizure of the typewriter.

Collins also used deception by lying that Petitioner's typeset was "similar" to that on the anonymous letters (EX 15). Robillard found no similarity (EX 17). Where police lied in a warrant application that nails used in a bomb were identical to those kept in a suspect's home, when they weren't even similar, the warrant was invalid and police were liable in tort.

Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1292 n.14 (9th Cir. 1999) (denying police qualified immunity in § 1983 cause).

Sgt. Collins didn't stop there. He lied repeatedly. In his report (EX 13) and affidavit (EX 15), Collins claimed that the cards had been processed by MA State Police and found to contain no fingerprints.

But on 11/3/06, MA State Police confessed to Petitioner that they've "no records" of fingerprint testing (EX 19). Either of two things occurred:

- Fingerprint analysis was consciously evaded so that Bussiere could not be implicated as the author, forcing Collins to lie about it; or

- Fingerprints of someone other than Petitioner were found, and by 11/3/06 all records had been destroyed to prejudice Petitioner.

Perhaps police knew Petitioner would be hailed into a clown court that cannot understand anything. The judges of this court would disagree that the grass is green unless assured by a government agent.

It is clearly established that lying to an officer to procure a warrant is unlawful. Hampton v. Oktibbeha County Sheriff Dept., 480 F.3d 358, 364 (5th Cir. 2007). "A seizure conducted pursuant to a warrant obtained by judicial deception violates the Fourth Amendment." Whitaker v. Garcetti, 486 F.3d 572, 581 (9th Cir. 2007) (no qualified immunity for policemen who "falsified an affidavit for the warrant application").

A suspect was convicted of threatening a member of Congress when FBI found his palmprint on an unsigned death threat letter. U.S. v. McKinney, 88 F.3d 551, 554 (8th Cir. 1996). A government fingerprint technician identified a fingerprint found on a threat letter mailed from prison to a state prosecutor. U.S. v. Slaughter, 116 F.Supp.2d 688, 691 n.4 (W.D.Va. 2000). Threats mailed to a court by an inmate contained his fingerprints on the letters and envelopes. U.S. v. Lincoln, 589 F.2d 379, 380 (8th Cir. 1979); see also U.S. v. Polson, 154 F.Supp.2d 1230, 1232 (S.D.Ohio 2001) (Secret Service uncovered two latent fingerprints on anonymous threat letter and matched them with defendant's prints in FBI database).

Here, we're supposed to believe a store clerk placed the cards on a shelf, a customer purchased them, a cashier rang them up, the author typed on them and mailed them, numerous postal personnel handled them, and Debra Sellers pulled them from her mailbox (likely showing them to her parents),

all without a single print being deposited. Only a fool - an imposter - such as Judge DiClerico would fall for such a corny magic trick. Regardless, the new evidence (EX 19) shows that the cards were not examined for prints. The warrant was obtained through trickery and deceit.

VII. ALAN ROBILLARD HAD A CONFLICT THAT AFFECTED HIS JUDGMENT.

Petitioner has standing by a certified, objective ex-FBI document expert anxious to examine the anonymous letters and compare them to Lt. Bussiere's typeset on EX 14. See EX 22. The new expert disputes Robillard's contention that he had to have Petitioner's Smith Corona to determine if the anonymous cards came from it. Robillard gave odd testimony 10/21/99, acknowledging that Collins approached him about typewriting and that he asked Collins to seize computers, bubblejet printers, etc., "to touch all the bases." Robillard defended Collins 10/21/99, even after telling Roy (EX 18) there was no probable cause to apply for the warrant. None of this makes sense.

In 1996, FBI SA Fred Whitehurst implicated Robillard on CNN as being involved in sloppy, disingenuous practices at the crime lab where tests were administered in a biased manner to assist prosecutors.

In his 8/31/99 letter to Petitioner, Robillard admitted he is under contract to the people who framed him (EX 21). Rather than submit the evidence to an impartial expert, Ed Roy relied on the confusing, conflicted Robillard. Whether an expert witness is biased toward a party is a relevant issue. U.S. v. Abrams, 427 F.2d 86, 90 (2d Cir.), cert. denied, 400 U.S. 832 (1970):

> "The existence of bias or prejudice of one who has expressed an expert opinion can always be examined into on the cross-examination of such expert; as well as the facts upon which his expert opinion was based."

U.S. v. Preciado-Gomez, 529 F.2d 935, 942 (9th Cir.), cert. denied, 425 U.S. 953 (1976).

Typeset cannot be "similar" as asserted by Collins (EX 15):

> "Expert testimony as to questions of the authenticity of typewritten documents falls into two categories: the identification of the writer who uses a particular machine, and the identification of the machine on which the document was written. For the purposes of authenticating typewritten documents, the courts have recognized for some time that the individuality of a typewriter and its operator are as distinctive as handwriting."

31A Am Jur 2d § 138, p. 159 (2002) Expert and Opinion Evidence.

The distinctive individuality of the anonymous cards would have been known to Robillard, had he conducted a pre-search investigation. A typewriter's unique characters are identifiable in the FBI's "comprehensive collection of typewriter standards available to a document examiner." O'Ferrell v. U.S., 32 F.Supp.2d 1293, 1303 (M.D.Ala. 1998), aff'd, 253 F.3d 1257, 1270 (11th Cir. 2001).

In O'Ferrell, the FBI's document experts matched the typeset on pro se court pleadings to the typewriter that produced anonymous death threats. Id., 32 F.Supp.2d at 1300. According to those adjudicated facts, Robillard had the ability to consult his typewriter standards file prior to 2/8/99 and determine that the Sellers greeting cards did not come from the machine that produced Petitioner's "K2" samples (EX 17). Robillard was deceptive, straining his imagination to assist marauding police who employ him.

And Ed Roy failed to properly certify Robillard as a qualified expert. Roy only established on 10/21/99 that Robillard is a document expert who worked for FBI. That's not enough.

A document expert is qualified when he submits to proficiency tests twice a year, and all his work is reviewed and confirmed by at least one other document examiner. U.S. v. Mooney, 315 F.3d 54, 62 (1st Cir. 2002). The examiners generally are certified by the American Board of Forensic Document Examiners. Id.

Whether Robillard meets these criteria is unknown. Certainly, and curiously, he did not have his opinion to Collins - that the Smith Corona must be seized - reviewed by at least one other examiner. A second examiner who is suspicious of Robillard's dubious opinion wants to examine the cards himself (EX 22). That new expert is questioning Robillard's key holding that the typewriter had to be seized prior to an examination of the cards. Robillard is undermined by O'Ferrell.

The above authorities provide one conclusion: Robillard had the means to compare both anonymous cards to Petitioner's "K2" court pleadings. He'd have determined they did not match and the Smith Corona was irrelevant. Upon consulting his FBI typewriter standards file, he'd have known the greeting cards had no characters unique to Smith Corona. This work that he didn't do would have then been corroborated by a second examiner, all prior to 2/8/99.

Then again, maybe these routine procedures apply to every citizen except

the unpopular Petitioner.

VIII. THIS BIASED COURT HAS MISAPPLIED FOURTH AMENDMENT JURISPRUDENCE.

One of the many pranks this court pulled on Petitioner was the grotesque mishmash of the law handed up by a smirking Judge DiClerico 11/3/99. Contrary to that decision denying the motion to suppress, Fourth Amendment law clearly states that,

1) Execution of a search warrant may not be pretextual;
2) Police may only take that which is authorized pursuant to the warrant;
3) The search's scope is limited by the terms of the warrant's authorization; and
4) Evidence not described in a warrant may be seized if it has a nexus with the crime under investigation.

Judge DiClerico enunciated those basic, universal rules in U.S. v. Cardiges, 881 F.Supp. 717, 723-24 (D.N.H. 1995) (conceding that a warrant must be valid). He did not apply his own substantive law, as the judge is a biased fraud.

These 45 exhibits prove the following hard facts:

1) The phony warrant was a pretext to aceess the firearm that Sellers knew Petitioner owned back in 1997 (EX 7);
2) Police seized the Smith Corona immediately upon entering, then continued a general rummaging of the bedroom for "15 minutes" (10/21/99 TR of Collins' testimony);
3) Even if police did not type the crank letters themselves, the search would have had to have been limited to seizure of typewriters, not "hard drives," as police always knew the anonymous cards were created by a typewriter (EXs 13, 15, 16, 17, 18);
4) The firearm, which was not even in plain view, U.S. v. Paradis, 351 F.3d at 30-32, had "no nexus" to the crime under investigation.

On these newly documented facts - several of which were record facts on Oct. 21, 1999, Cardiges compels a finding of a Fourth Amendment violation. ""Simple justice" is achieved when a complex body of law developed over a period of years is evenhandedly applied." Federated Dept. Stores, Inc. v. Moitie, 452 U.S. 394, 401 (1981).

Paradis suppressed a handgun because police moved clothing to expose it. Officers entered a dwelling without a warrant, used their foot to move a duffle

bag, which exposed a gun. The plain view exception was inapplicable and the contraband suppressed. U.S. v. Thomas, 190 F.Supp.2d 49, 56-57 (D.Me. 2002). Cash wrapped in aluminum foil in a freezer was concealed and not in plain view. U.S. v. Gonzalez Athehorta, 729 F.Supp. 248, 259-60 & n.5 (E.D.N.Y. 1990) (package in freezer had to be removed and unwrapped before officers could determine if it was evidence of drug activity).

The 10/21/99 evidentiary record only shows that Sgt. Collins found the firearm in the bedroom dresser. A disinterested Ed Roy failed to establish the crucial fact material to Paradis, 351 F.3d at 30-32, that police had to move clothing inside the drawer to reveal the handgun. Prejudice from ineffective assistance can be grounded in the failure of an attorney to litigate a meritorious Fourth Amendment claim that would have excluded the evidence. U.S. v. Caggiano, 899 F.2d 99, 102 (1st Cir. 1990). A pretrial suppression hearing is a critical stage at which the right to effective assistance of counsel attaches. Henderson v. Frank, 155 F.3d 159, 166 (3d Cir. 1998).

The supposed "crime" named in the warrant application (EX 17) would have been a nonviolent misdemeanor. M.G.L. c. 209A. The authority of officers to approach a house under a misdemeanor arrest warrant does not extend to a warrantless and unreasonable search of the house. U.S. v. Reynolds, 526 F.Supp.2d 1330, 1342 (N.D.Ga. 2007).

A search warrant was invalidated in part because a detective omitted information that the wife of defendant who supplied information to police was romantically involved with a city police officer. U.S. v. Cowdin, 984 F.Supp. 1374, 1377 (D.Kan. 1997). This is akin to Petitioner's proof that Sellers had a "friend" in Ed Roy's RI State Police (EX 6).

A general description of property to be seized imposes too much discretion on an agent. U.S. v. Smith, 23 F.2d 929, 930 (1st Cir. 1928). Here, police confused Judge DeRobbio as to which kind of machine may have produced the cards. No basis existed for trying to seize "computer components" (EX 18).

Police executing a search warrant found the item named in their warrant on the floor of a closet. They continued to look for and seized evidence of the same crime beneath a mattress. The evidence under the mattress had to be suppressed. U.S. v. Highfill, 334 F.Supp. 700, 701 (E.D.Ark. 1971). The court went on to say that,

It "has no doubt that items discovered in a search continued after the described items have been found must be suppressed. The very fact that the search continued after discovery of the item described indicates that the search had a further objective." Id., at 702.

After seizing the irrelevant Smith Corona from the kitchen table, Sgt. Collins pressed the 15-minute rummaging of the bedroom (looking for the gun). The intrusion must be justified by probable cause. U.S. v. Micheli, 487 F.2d 429, 432 (1st Cir. 1973). "Furthermore, any searches which are deemed necessary should be as limited as possible." Id.

Police had a warrant to search for stolen clothing. Four detectives were admittedly looking for narcotics during the search. They found a revolver that led to a felon-in-possession conviction. The court suppressed the gun. U.S. v. Tranquillo, 330 F.Supp. 871 (M.D.Fla. 1971). "They were hunting for any evidence of wrongdoing they could find." Id., at 876.

To investigate an arson suspect, police obtained a warrant to search his home for gambling paraphernalia, which was subterfuge and a pretext for seeking arson evidence. The search and seizure of arson evidence without a warrant was unreasonable. U.S. v. Belcher, 577 F.Supp. 1241, 1247 (E.D.Va. 1983). The motion to suppress was granted. Id., at 1257.

Since police could have obtained a search warrant for evidence whose discovery they fully anticipated, a warrantless search beyond a scope necessary to effect an arrest, and a search warrant based on plain view observations of police during the search, were invalid. U.S. v. D'Alo, 486 F.Supp. 945, 953 (D.R.I. 1979). Police knew of a slug-making crime when effecting an arrest for theft of a truck. They used the arrest warrant to observe evidence of slug-making operations. Id. An arrest may not be used as a pretext to search for evidence. Id. at 949. "This Court is greatly distressed by the opportunism displayed by the Warwick and State Police in this case." Id. at 953. (See also Terrell v. Petrie, 763 F.Supp. 1342, 1345-46 (E.D.Va. 1991), for an analysis of cases and law reviews on pretextual warrants.)

Likewise, here it was "opportunis[tic]" for police to learn from Sellers that Petitioner owns a firearm, then come into receipt of anonymous letters with RI postmarks leading them right to it. Some cops are just lucky.

As aforestated, the marauding police didn't know Petitioner had a felony record on 2/8/99, and thus told Prof. Horwitz the gun is legal (EX 28). The

incriminating character of the contraband must be immediately apparent to police, otherwise it must be suppressed. Arizona v. Hicks, 480 U.S. 321 (1987) (where executing officers had to move stereo to find serial numbers, and post-seizure investigation revealed that stereo was stolen, evidence had to be suppressed); U.S. v. Szymoniak, 727 F.2d 95, 98 (6th Cir. 1984) (police had to confer with firearms expert to determine if rifle was illegal; seizure violated Fourth Amendment):

> "We reject the government's suggestion that a police officer with no knowledge of a citizen's criminal history may constitutionally seize firearms or ammunition without a warrant, so long as the citizen turns out to be, in hindsight, a convicted felon."

U.S. v. Blom, 242 F.3d 799, 808 (8th Cir.), cert. denied, 534 U.S. 880 (2001).

A claim of unconstitutional search and seizure is cognizable in a § 2255 proceeding. Baranski v. U.S., 515 F.3d 857, 860 (8th Cir. 2008).

Finally, as proven by EXs 17 and 19, marauding police avoided pre-search fingerprint and DNA testing that would have identified the author, when that is the very nature of a detective's job.

An innocent suspect was arrested without probable cause where an officer withheld from a warrant affiant exculpatory DNA analysis, resulting in its omission. The officer's defense of qualified immunity to a § 1983 claim was denied, and his grant of summary judgment reversed. Burke v. Town of Walpole, 405 F.3d 66, 84 (1st Cir. 2005).

The withholding of exculpatory DNA findings in Burke is no different than here, where police departed from normal procedures to stymie their own "investigation" so as not to inculpate Lt. Bussiere. Fingerprints retrieved from anonymous letters regularly solve crimes. U.S. v. Myers, 503 F.3d 676, 680 (8th Cir. 2007) (defendant's prints on threat letters to court clerk); U.S. v. Lincoln, 589 F.2d 379, 380 (8th Cir. 1979) (death threats mailed to court had inmate's prints on letters and envelopes); U.S. v. Polson, 154 F.Supp.2d 1230, 1232 (S.D.Ohio 2001) (Secret Service uncovered two latent fingerprints on an anonymous threat letter and matched them with defendant's prints in FBI database).

A district court may order assistance of an adequate fingerprint expert if a defendant has a "plausible defense." U.S. v. Smith, 502 F.3d 680, 686 (7th Cir. 2007) (appointed expert found defendant's thumb print on a bag inside a bomb and he was justly convicted).

To feign probable cause, this disreputable court, which only reverses convictions of Mob hitmen, ignored all of these facts, misinterpreted the law, distorted Petitioner's theories for relief and denied fair procedure. Lacking a single day of discovery or subpoena power, and from his jail cell, Petitioner has produced 45 exhibits invalidating both the warrant and this court's oddball judgments.

IX. THIS MOTION MUST BE REASSIGNED TO ANOTHER CIRCUIT.

On 11/29/01 at Camden, NJ, DUSM Bartlett testified that in summer 2000, a year before this § 2255 proceeding was commenced, Judge DiClerico considered his safety - even at home - to be threatened by Petitioner and asked USMS to "track" his movements (EX 35). As already demonstrated, back in 1989, Judge Lagueux removed Petitioner's civil § 1985(2) complaint from the file in No. 89-cv-0011L and replaced it with a counterfeit (EXs 29-31). Chief Judge Boudin is a proven liar and a member of the NJ prosecution team (EXs 38-44). The RI judiciary has a grudge against Petitioner for successfully opposing Judge Israel's bid for RI Supreme Court (EX 1), and for having a series of letters published in Providence Journal scoffing the bad judges (EX 5). In a brazen act of monstrous judicial fraud, bya fraud, Judge DiClerico quickly dismissed this action 5/17/01 (EX 36A), to beat the NJ indictment by a day (EX 37).

This Rule 60 motion cannot be fairly adjudicated by an obviously crooked group of cronies who belong in the ACI. Fraud is where the court or a member is corrupted or influenced or where a judge has not performed his judicial function. Switzer v. Coan, 261 F.3d 985, 988 (10th Cir. 2001).

"[T]he public spirited and thoroughly impartial judge does not want innocent men to be convicted." Figueroa Ruiz v. Delgado, 359 F.2d 718, 720 (1st Cir. 1966).

Would a reasonable, objective person believe that Judge DiClerico and CJ Boudin wish to see justice done and the warrant invalidated? The statute, § 455, applies to Courts of Appeals, too. Pilla v. American Bar Assn., 542 F.2d 56, 58 (8th Cir. 1976). No lawyer could represent Petitioner within the Circuit for he'd be intimidated by the judges' bias, which could hinder his performance. Tejeda v. DuBois, 142 F.3d 18 (1st Cir. 1998) (counsel's fear of trial judge required reversal of order denying § 2254 writ).

Plus, these Circuit judges have promised Ed Roy a RI judgeship - a fact he disclosed to client Arthur Jordan in early 2005.

The entire First Circuit is required to recuse.

## X. THE EFFECT OF CUMULATIVE ERRORS REQUIRES A NEW TRIAL.

Cumulative error can warrant reversal regardless that no individual error warranted reversal. State v. Jenewicz, 193 N.J. 440, 473, 940 A.2d 269, 289 (2008). "The thematic effect of those errors requires that they be evaluated cumulatively." Id. at 474, 940 A.2d at 289. A postconviction court may consider the cumulative effect of counsel's errors in determining whether a defendant was prejudiced. Dugas v. Coplan, 428 F.3d 317, 335 (1st Cir. 2005). "We note that in the context of a criminal trial, an accumulation of errors can likewise be grounds for a new trial." Latiolais v. Whitley, 93 F.3d 205, 210 n.7 (5th Cir. 1996).

Virtually none of this evidence was procured in 1999 by Ed Roy. The case was not defended. How many mistakes are enough?

## XI. THE COURT MUST TAKE EVIDENCE CONCERNING ED ROY'S CONFLICT.

As EX 21 demonstrates, by July '99 Petitioner and Ed Roy were divided.

A felon-in-possession conviction was set aside over a denial of a continuance to allow a defendant to retain counsel, based on differences with appointed counsel. U.S. v. Prochilo, 187 F.3d 221 (1st Cir. 1999) (abuse of discretion for district court to deny new counsel without any inquiry or findings). This is why Petitioner may invoke Rule 60(b) to complain of unfair and improper procedures. In both the criminal case, No. CR 99-024, and the instant matter, he never had a hearing on this issue.

There is a Sixth Amendment right to an attorney's undivided loyalty free of conflicts of interest. U.S. v. Arnold, 913 F.Supp. 348, 350 (E.D. Pa. 1995) (attorney disqualified where defendant refused to waive conflict).

Ed Roy's hostility toward Petitioner caused him to meet only 3 times with his client, over 16 months, and that was ineffective assistance in Vasquez v. Bradshaw, 522 F.Supp.2d 900, 925 (N.D.Ohio 2007) (breached duty to learn as much as he could from prosecutor, defendant and other witnesses about additional allegations against client).

There is plenty of evidence that Roy hated Petitioner prior to being assigned 5/5/99. Petitioner, having made the requisite allegations in his § 2255 motion, is entitled to try to prove it in an evidentiary hearing.

The split between Petitioner and AUSA Roy started with Roy's absurd § 4241(a) motion of 4/30/99, a sleazy, unethical tactic designed to stash Petitioner far away because Roy wasn't ready for the 5/11/99 suppression hearing. Petitioner would not agree to a continuance. Roy maliciously prosecuted Petitioner with the baseless § 4241 motion, having recently obtained a glowing competency report from Dr. Alan B. Feinstein of ACI on 3/9/99 (EX 25). FCI Butner also found no competency question. See U.S. v. D'Amario, 2 Fed.Appx. 25, __ (1st Cir. 2001) (noting that Petitioner passed his § 4241 exam).

Tensions increased throughout 1999 as AUSA Roy strangely refused to ever provide his client with copies of the anonymous greeting cards. Roy was still offering lame excuses for not divulging the cards well into 2000 (EX 24).

As if to provoke and agitate Petitioner, AUSA Roy wouldn't even share the anonymous cards with Petitioner's private investigator (EX 23). One would expect such obstructive maneuvers from an Attorney General, not the "defense" attorney of record.

Fed up with Roy's weird behavior and secrecy, by July '99 Petitioner had tried to enter his appearance pro se for the third time (EX 26). Judge DiClerico, delighted to see the defense self-destruct, didn't even hold a hearing inquiring into the conflict.

Prof. Andrew Horwitz would have been a valuable defense witness at the Franks faux hearing of 10/21/99. During the search, and minutes after Sgt. Collins seized the firearm, Capt. Catlow told Horwitz over the phone that no arrest was being made because the gun is legal under RI law (EX 28). Can AUSA Ed Roy, the judges' darling, excuse his failure to call Horwitz?

Included as EX 27 is a memo that was faxed to Roy in late Feb. '99 by Susan Petit, Petitioner's girlfriend. Petit wrote to Roy, "You may also contact Andy Horwitz regarding this case - 276-4880. Please contact Andy." (EX 27.) Roy knew prior to indictment that Prof. Horwitz had talked to Catlow, and didn't even bother to interview him. How can a court expect Petitioner to maintain cordial relations with such a terrible "defense" lawyer? Whether the relationship broke down in early '99 is a factual matter that cannot be summarily dismissed.

XII. CHIEF JUDGE BOUDIN IS LYING AGAIN.

As Petitioner completed this Brief, he received another letter from CJ Boudin, tagged as EX 46. On 5/5/08, CJ Boudin again lied that he did not receive, and did not leak to prosecutors, Petitioner's Judicial Council complaints of Nov. 2001 (EXs 38 and 39). All Petitioner had sent Boudin was the USMS cover sheets (EXs 41 and 42).

The Chief Judge was unaware on 5/5/08 that Petitioner also possessed DUSM Bartlett's personal logs from Nov. '01 and 12/6/01 (EXs 43 and 44). Bartlett wrote in Nov. '01: "Received info from Chief [Marshal] re: letter received by 1st Circuit Appeals Judge Boudin in chambers from D'AMARIO." (EX 43.) On 12/6/01, Bartlett wrote: "Received letter by fed-ex from 1st Circuit court of appeals in Boston."

Chief Judge Boudin, like Sellers, is a habitual liar unfit for office. He has outrageously lied twice in writing. This case is structurally defective.

CONCLUSION

Petitioner has shown cause for reopening the judgment so that he may prove his claims of illegal search/seizure and ineffective assistance, and as appropriately implemented Rule 60(b).

The motion must be referred to a judge from without the Circuit, as Judges DiClerico and Boudin are members of the NJ prosecution team who've been lying to cover up their involvement with the executive branch. More seriously, in 1989, Judge Lagueux committed the crime of obstruction of justice in Russo. In the wake of such a horrific act, no such party could ever receive a fair hearing in the same court.

Even absent a hearing, Petitioner's exhibits would convince any impartial mind that executing officers wrote the anonymous letters themselves to locate the little gun, and that "AUSA" Roy presented no challenge.

PETITIONER, pro se,

[signature] 5-13-08

Arthur D'Amario, III

cc:
AUSA Adi Goldstein
50 Kennedy Plaza
Prov., RI 02903

 EX I

Jones Associates △ Attorneys at Law

72 South Main Street
Providence, RI 02903
Telephone 401 274-4446
Fax 401 274-2805

Lauren E. Jones

Robert S. Thurston
David L. Krech
Mark L. LaBollita

December 4, 2007

**Arthur D'Amario 02989-070**
FCI Englewood
9595 West Quincy Avenue
Littleton CO 80123

Dear Arthur:

I received your letter of September 4, 2007. I apologize that it has taken me so long to respond.

On August 30, 1995, is a long time ago. There is no doubt, however, that I recall hearing John Barrette say, either to the judges or generally, that he thought you were there to testify against a judge. I do not recall the specific words that he said and I cannot confirm the quotation in your letter, a copy of which I am enclosing.

Unfortunately, I also cannot confirm that Judge DeRobbio was present in the crowd that night. I just do not remember at this point. However, the records at the Judicial Nominating Commission would show whether DeRobbio testified that night and I guarantee you that, if he was there, he testified.

With respect to your other question, a lawyer skilled in the Fourth Amendment who might take on your case and file a petition, I am afraid I do not have much I can give you there. The criminal lawyers I know are all in Providence and you know them as well as I do. My best suggestion to you would be to find someone in Boston or the Massachusetts area who would be willing to take on your case. Obviously, another angle would be the Innocence Project at Roger Williams University and the Innocence Project run by Barry Scheck in New Jersey.

Sorry I cannot be more helpful.

Very truly yours,

Lauren E. Jones
*ljones@appeallaw.com*

LEJ/smc
Enclosure

2

State of Rhode Island and Providence Plantations

DEPARTMENT OF ATTORNEY GENERAL

150 South Main Street • Providence, RI 02903

(401) 274-4400

TDD (401) 453-0410

*Patrick C. Lynch, Attorney General*

February 27, 2008

Mr. Arthur D'Amario
Federal Correctional Institution
9595 W. Quincy Avenue
Littleton, CO 80123

**Re: D'Amario v. Judicial Nominating Commission**

Dear Mr. D'Amario:

I am writing in regards to the Access to Public Records Act [APRA] complaint you filed against the Judicial Nominating Commission [Commission]. Since your APRA complaint was filed, it appears that the Commission has responded to your original records request. If you do not wish to withdraw this APRA complaint, please notify the undersigned within thirty (30) days. If we do not hear from you by the end of March, 2008 your file will be closed. Moreover, if you believe the response from the Commission is not responsive, kindly state the reason(s) why the response is incomplete.

If you have any questions, please feel free to contact me. Thank you for your cooperation.

Very truly yours,

James Lee
Assistant Attorney General

JL/pl

3

JUDICIAL NOMINATING COMMISSION

MEETING OF COMMISSIONERS

PUBLIC SESSION

**August 30, 1995**

A meeting of the Judicial Nominating Commission was held on Wednesday, August 30, 1995, in Public Session, at 4:00 p.m., at the Department of Administration, One Capitol Hill, Second Floor, Conference Room #A, Providence, Rhode Island, pursuant to notice of the meeting to all Commissioners and public notice of the meeting as required by Section 45-46-6 of the Rhode Island General Laws.

The following Commissioners, constituting a quorum, were present and participated throughout the meeting as indicated: Michael Kelly, Dr. Pablo Rodriguez, Lise Gescheidt, George Hartmann, Sharon Burgess, Peter McGinn, William Devereaux, Alan Flink, and David Campbell.

Absent: None

Also present: Kathleen Sousa, Legal Assistant.

Mr. Kelly presided over the meeting and Ms. Sousa acted as recording secretary.

1. CHAIRMAN'S REPORT.

Mr. Kelly called the public meeting to order noting that following the Governor's issuance of a Notice of Vacancy on the Supreme Court, an advertisement was published in 11 newspapers throughout the State, including those focusing upon minority comunities, encouraging applicants to fill the judicial vacancy. In addition, correspondence was also forwarded to the Black Lawyers' Association, the RI Womans' Bar Association, and the Minority Judicial Task Force seeking additional applicants. Following review of questionnaires and supporting materials submitted by 29 applicants, 13 applicants were selected to be interviewed. Each were interviewed in a public meeting by the entire Commission. Written public comment was encouraged relative to the applicants under consideration and many letters were received and reviewed by the Commissioners. The applicants under consideration today are: Margaret Curran, William Dimitri, Jr., Robert G. Flanders, Jr., Barbara Hurst, Judge Richard Israel, Lauren E. Jones, Peter Lawson Kennedy, Magistrate Robert Lovegreen, John A. MacFadyen, Judge Mark Pfeiffer, William Robinson, Everett C. Sammartino, Kent A. Willever. It was requested that comments be brief and restricted to the qualifications of the candidates.

Following public comment, the Commission will adjourn to executive session under the Open Meetings Law and deliberate relative to the applicants. If time permits, the Commission will then reconvene in public session for a vote.

2. PUBLIC COMMENT RELATIVE TO JUDICIAL APPLICANTS

1. Mark DiSisto - addressed the Commission on behalf of Lauren Jones stating that it is difficult in a few minutes to impress upon the Commission his strong belief that Lauren Jones should be one of those nominated to the Governor. He further indicated that he had looked to the statute for qualifications to be sought in the nominees, and feels that the Commission has much of that information regarding the candidates already. Temperament, impartiality and intellect are qualities that the Commission could use some assistance in assessing. In his opinion, Lauren Jones is judge-like. He has known him for a long time, has tried cases with him, and has found him to be very impartial. Mr.DiSisto stated a high regard for Mr. Jones' intellect and his ability to get to the heart of a matter and simplify it. He further stated a need on the court for someone who comes directly from the Bar. In his opinion, Lauren Jones fits the bill as an attorney who practices appellate law.

2. Judge Anthony Gianninni - addressed the Commission on behalf of Judge Israel and Judge Pfeiffer of the Superior Court. These judges deal with individuals who will be involved in judicial review and in fashioning opinions exercising their jurisdictions regarding appellate review. Judge Giannini recounted the appointment of Supreme Court judges from 1935 by the Grand Committee to the present. Of the 31 supreme court judges nomnated since 1935; 13 were trial judges; 10 of them superior court trial judges. In his opinion, trial judges bring to the appellate process a sense of humanity needed in the fashioning of the law. All were qualified, some more than others, but all who came from trial courts brought the same kind of personality in recognizing that those before them are human beings. He urged the Commission to maintain a tradition in existence for over 60 years, nominating superior court judges and leaving the final decision to Governor Almond.

3. Judge Alice Gibney - addressed the Commission on behalf of Judge Mark Pfeiffer, a colleague and friend. Judge Pfeiffer has served upon the superior court for 7 years, managing the trial calendar for 2.5 years. He has rendered an exemplary performance in fullfilling that assignment due to his energy, pragmatism, congenial manner, and his graciousness to members of the bar and to the public. He is noted for being respectful to all people and is respected in return; noted for sensitivity, compassion; and his belief that the process is as important as the outcome. He is intelligent and, by temperament, an excellent judge and would be an asset to the supreme court.

4. Judge Joseph Rogers - addressed the Commission on behalf of Judge Israel and Judge Pfeiffer with whom he works. Judge Rogers submitted a letter to Commission and asked that it be made a part of their records. As the Presiding Judge for over 4 years, he attributes the court's good reputation largely to Judges Israel and Pfeiffer. Although some members of the bar indicated that they would hate to loss either judge from the superior court, he believes that both deserve an opportunity to be considered by the Governor. He further indicated that both are hard working, intelligent, and fair minded. Judge Israel has written 200-250 decisions in the last year alone and has experience in appellate review. He stated that both are independent minded and not reluctant to express opinions without being disagreeable.

5. Peter DiBiase - addressed the Commission on behalf of Terry MacFadyen indicating that he had appeared before Commission several months ago and spoke extensively. He has known Mr. MacFadyen for 20 years and has seen him develop into one of the finest appellant attorneys. In his opinion, Mr. MacFadyen has outstanding intelligence, is ideally suited for the supreme court, and is an honorable, decent, and compassionate man possessing appropriate moral character and disposition to make him an ideal jurist. Mr. DiBiase further stated that his personal life is very stable and devoted to his wife and 3 children. In his opinion, the Commission could find no more stable lawyer to include in its list to the Governor and the Governor should have opportunity to have this truly unique, talented lawyer on the list to choose from.

6. Judge DeRobbio - addressed the Commission on behalf of William Dimitri and Judge Israel stating that he had sent letters to Commission on behalf of both and wished to incorporate them into his remarks for the Commissioners review during deliberations. Judge DeRobbio's career has paralelled both having known Judge Israel for 45 years through high school, the attorney general's office, and on the bench. Mr. Dimitri served as a clerk in Judge DeRobbio's law office and they served together as assistant attorneys general. He stated that both possess attributes necessary to be recommended to the Governor for final selection. He also indicated that both are knowlegeable in the law, treat people with fairness and honesty, have great integrity, and most important, are trustworthy and fair.

7. Norman D'Andrea - addressed the Commission on behalf of Bill Dimitri, Lauren Jones, Everett Sammartino having had professional contact with all three during his more than 40 years of practice. He indicated that they stand out above the ordinary lawyer and are complete professionals. All three are qualified and will add to the power of the court. They understand litigation and are not settlement lawyers or house counsel, they are litigators in some of the most difficult cases imaginable.

8. John Tramonti - addressed the Commission on behalf of William Dimitri, Jr. having tried cases with him and spending as many as 2 months on same trial. He knows Mr. Dimitri as a man whose word is his bond. He is a workaholic with even temperament, "Mr.Cool", and low key. He urged Mr. Dimitri's nomination to the Governor.

9. Steven Famiglietti - addressed the Commission on behalf of John MacFadyen indicating that he had spoken on his behalf a couple of months ago. He has known Mr. MacFadyen for 20 years referring to him as a lawyer's lawyer with incredible work ethic and dedication to his clients. Mr. Famiglietti stated that he has never known anyone in the legal profession with more integrity and a sense for what is fair and just. He has a respect for the law and is extremely well-read being known as a constitutional scholar making his mark as an appellate attorney who has shaped the law. Mr. MacFadyen has had the honor of successfully arguing a case before the US Supreme Court. He has been invited to participate as a member of the American Academy of Appellate Lawyers, a distinguished organization limited to 500 members which certifies him as one of the top appellate lawyers in the U.S.

10. Allan Gelfuso - addressed the Commission on behalf of Bill Dimitri having met him the day he was sworn in as a member of the bar 27 years ago. He recounted how Mr. Dimitri took him by the hand and assisted him and that their paths have crossed frequently throughout the years. He knows Mr. Dimitri to be bright and hardworking and he will always remember how he took the time to treat a young lawyer out of school.

11. Thomas Wright - addressed the Commission on behalf of Judge Richard Israel, his mentor when he first started practicing law. He stated that Judge Israel had prosecuted high profile cases in the l970s and served with him as an attorney general. Judge Israel has added an important element to academia teaching at Roger Williams University for over 10 years with students remembering his classes and his willingness to share his knowledge with students.

12. Frank Williams - addressed the Commission on behalf of William Dimitri and Judge Pfeiffer indicating that he had met Mr. Dimitri when he clerked for the Attorney General and has worked with him on cases coming to know his strengths. Judge Pfeiffer and Mr. Williams practiced together and Judge Pfeiffer had previously represented him. Mr. Williams stated that he can attest to strength and resilience of both and that both are "gentle" combined with an iron strength, a toughness so that difficult decisions can be made and stood by.

13. Christopher Goncalves - addressed the Commission on behalf of Judge Israel with whom he has been acquainted for 18 years. They met when Goncalves was a Special Assistant Attorney General in Newport County praticing before Judge Israel. He stated that Judge Israel is well known in Newport County as the fairest, most open minded jurist they have had in that County and that he goes out of his way to give everyone a fair trial.

14. Barbara Cohen - addressed the Commission on behalf of Judge Israel whom she has known for 13 years. Ms.Cohen met him right out of law school working with him when he was a partner in a Providence law firm and continued to do so until his appointment to the bench. She indicated that Judge Israel set and met high standards, is a daily example of integrity, honesty, and has respect for the rights and opinions of others. She considers it a privilege to have been trained by a lawyer of his caliber. He has experience and superior intelligence and ability which personal traits have made him an exceptional attorney and judge. He has continued to display those characteristics as a loving and supportive father, husband, and grandfather.

15. Joseph J. Buono - addressed the Commission on behalf of Peter Lawson Kennedy who has represented his firm for over 20 years. He stated that Mr. Kennedy's representation has been beyond reproach and excellent. In his business dealings throughout the country, Mr. Kennedy has represented him at the highest professional level.

16. Eugene Mollicone - addressed the Commission on behalf of William Dimitri having known him since l981 through Southern New England School of Law where he stressed committement to the profession of law. As a lawyer in Mr. Dimitri's firm he vouches for his boundless energy with every client receiving his unyielding attention at all times.

17. Anthony Philips - addressed the Commission on behalf of William Dimitri as a retired police officer knowing Mr. Dimitri for over 25 years. During that time, he had several cases with him while a police officer and Mr. Dimitri an assistant attorney general. He was also his instructor at Roger Williams College where he was known for his integrity and knowledge of the law making him a very suitable candidate.

18. Ronald Fishbein - addressed the Commission on behalf of Lauren Jones having known him since l980. Mr. Jones handles his more substantial appellate cases and is known for his love of the law. He stated that he would be an unquestioned asset to the court. Although he would lose a valuable resource, he urged the Commission to nominate Lauren Jones.

19. Edward Mulligan - addressed the Commission on behalf of William Dimitri having known him for 30 years. As a young lawyer, Mr. Mulligan watched him try cases and later worked with him in the attorney general's department where they handled civil case. Mr. Mulligan indicated that he is amazed with his mind, and his ability to know the law and a myriad of aspects of it. Mr. Dimitri works very hard handling a number of cases on the appellate level. He stated that he has an ability to empathize and listen to clients and truly understands what they are going through. These attributes he would bring with him to the Court and he would be an excellent candidate.

20. Richard Casparian - addressed the Commission on behalf of Barbara Hurst whom he has known for over 20 years. John MacFadyen and Barbara Hurst led the Public Defender's Appellate Division and Casparian worked with them for 19 years. Ms. Hurst has been head of division since 1981. She participates in continuing education, is a hard worker and dedicated public servant. He further indicated that she is an advocate for the poor and a legal scholar par excellence. Mr. Casparian describes Ms. Hurst as a public servant in the truest sense of the word.

21. Timothy Mueller - addressed the Commission on behalf of Judge Israel as a physician/psychiatrist on the faculty at Brown University. He knows Judge Israel for his honesty, integrity, and his ability to make a determination based on no preconceived ideas. He has known him and his wife for 5 years and stated that Judge Israel is even-handed and has an inquiring mind, continually reading, expanding his knowledge.

22. Joseph DeCorporale - addressed the Commission on behalf of William Dimitri whom he met 26 years ago when Mr. Dimitri was a prosecutor. He has defended cases with him, shared law office space with him, and noted that most cases Dimitri has worked on were of a high profile, whether prosecutor or defense lawyer. He stated that Mr. Dimitri's brilliance as a trial lawyer is legendary and stands out above the rest.

23. Lowell Smith - addressed the Commission on behalf of Peter Lawson Kennedy. Mr. Smith is a client of Mr. Kennedy's and is President of Nichols College, a former V.P. of academic affairs, a retired navy captain, and serves in the naval reserve. Mr. Smith noted that as a college president he has been exposed to more law then he had anticipated and that Mr. Kennedy represents the finest traditions of the law as a distinguished legal scholar. He knows him to be an effective, persuasive person who has advised him as to all issues that may arise. He has deep personal integrity and a sense of ethics which rivals those taught at Loyola by the Jesuits; a deep and abiding respect for the law.

24. Dianne Izzo - addressed the Commission on behalf of Lauren Jones as a 3rd year law student at Roger Williams University. She finds him to be kind and compassionate to students, ethical, and a believer in the law. The fact that he reached out to the University reflects a sense of compassion and a belief in the future of the law.

25. Thomas Harrington - addressed the Commission on behalf of Peter Lawson Kennedy. Mr. Harrington is a former Director of the Department of Motor Vehicles and a retired police officer. He worked closely with Mr. Kennedy when Kennedy was a town solicitor finding him extremely bright, honest, and professional and is proud to be his friend. In Mr. Harrington's 39 years as public servant, few have made the impression that Mr. Kennedy has and he strongly recommends his nomination to the Governor.

26. Sheldon Whitehouse - addressed the Commission on behalf of Margaret Curran as United States Attorney speaking on behalf of her demeanor, skill, and reputation noting that a thorough F.B.I. background check is performed on all U.S. attorneys. He has found her to be decent, thoughtful, quiet, good humored, and respected. In many respects, she is considered the intellectual leader of the office. The American Law Institute has invited Ms. Curran to join its select organization recognizing her appellate talents.

27. Judge Thomas Needham - addressed the Commission on behalf of Judge Israel and Judge Pfeiffer, the only 2 judges interviewed. Judge Needham, as senior judge on the trial court (22 years), has known both to have the same qualifications of honestly and integrity and to be students of the law. He noted that issues which ultimately reach supreme court for resolution are first addressed by trial judges without benefit of extensive briefs and the time required to make the hard decisons. Both have been doing that for years and most appellante reviews sustain the decision of trial judge.

28. Thomas Rogers - addressed the Commission on behalf of Peter Lawson Kennedy indicating that he met Mr. Kennedy when Kennedy was representing an adverse party. He was so impressed with that representation that he hired Mr. Kennedy as his attorney. Mr. Rogers stated that Mr. Kennedy has consistently represented him with concern and intelligence, that he is bright, works hard, and that he has a high code of ethics. Mr. Rogers urged Kennedy's nomination to the Supreme Court.

29. A. DeMario - addressed the Commission as a pro-se litigant who, in 1986, sought to hire Attorney Lauren Jones to handle an appeal of a civil rights case for him when his attorney was disbarred. He indicated that the retainer requested by Mr. Jones was far less than that of other appellate attorneys he spoke with, but that Mr. Jones had a conflict and could not handle his appeal. In order to insure that a timely appeal was filed, however, Mr. Jones personally typed a Notice of Appeal for Mr. DeMario and explained to him how to execute and file the same. Mr. DeMario urged the Commission to include Mr. Jones on the list of those nominated to the Governor.

30. Matthew Cimini - addressed the Commission on behalf of Mr. Dimitri, his neighbor for 20 years. Mr. Cimini indicated that he has watched Mr. Dimitri's family grow and that this fine man should be nominated to the Supreme Court.

31. Deborah Murphy - addressed the Commission on behalf of Mr. Dimitri noting that Mr. Dimitri worked several jobs throughout his school years and that he is dedicated to the law. She noted that he took a small law practice and has turned it into a great legal service. She further stated that Mr. Dimitri is within the top 100 criminal defense lawyers in the country and that he has attained that recognition through hard work and a love of the law.

32. Peter Murphy - addressed the Commission on behalf of Bill Dimitri noting that he has always been there for community and friends. Mr. Murphy praised Mr. Dimitri's role in the establishment of the Southern New England School of Law of which Murphy's wife (the previous speaker) is a graduate.

33. Francis Larkin - addressed the Commission on behalf of Mr. Dimitri indicating that he had previously submitted a letter urging Mr. Dimitri's nomination and requesting that it be considered for this vacancy. Mr. Larkin stated that a student had asked Mr. Dimitri what the law means to which he replied that it is a rare opportunity to do justice; that it is loyalty, civility, and a sensitivity to all human conditions.

34. Reverend Gordon - addressed the Commission addressed the Commission on behalf of Courtwatchers urging nomination of outsiders rather than judges currently sitting. Courtwatchers would like to see Captain Willever and/or William Dimitri nominated to fill the Supreme Court vacancy.

35. Dr. Cok - addressed the Commission on behalf of Kent Willever, a man who is a teacher of constitutional law and ethics, indicating that he will do a good job as an outsider with no political connections. She also indicated that she is impressed with William Dimitri seeing him as a humble, well-educated person. Dr.Cok also stated that she was impressed with Margaret Curran.

36. Charles Butterfield - addressed the Commission on behalf of William Dimitri noting that Dimitri was on the last list submitted to the Governor. He finds Dimitri as eminently qualified and a "people person". He stated that Dimitri is a grass roots person with a great deal of respect for individuals as demonstrated throughout his practice. He holds the dignity of

persons in high regard and has practiced in the trenches as a trial lawyer. Dimitri knows and understands people bringing back humanistic elements to the law. In his opinion, that respect for people would be exhibited in his decisions. He further stated that what we need today are people on the supreme court that the general people can relate to, who are qualified and have the respect of people.

37. Arthur Robbins - addressed the Commission on behalf of Judge Israel having known him for 55 years since growing up in Woonsocket. Mr. Robbins is involved in the development of the Newport and Providence Marriotts and involved in many civic organizations. He stated that Judge Israel walks with a soft stick and has a great love of education and feeling for people, along with great warmth and an understanding between right and wrong. He knows him as a great scholar, educator, and listener who would serve with dignity and class.

38. Stanley Woodhouse - addressed the Commission on behalf of Kent Willever noting that in the U.S. Navy, Captain Willever has been evaluated by his superiors annually for at least 30 years. He stated that Mr. Willever has a wealth of experience in every aspect of the law and that he has worked with him in sensitive, crisis situations. He further stated that Willever helped to write Navy standards and then worked to see that those standards were upheld. He finds Willever one of the most thoughtful, contemplative individuals he has ever worked with recommending him without reservation. Mr. Willever's wife is from Rhode Island and daughter a graduate of Brown University.

39. Hardu Keck - addressed the Commission on behalf of Peter Lawson Kennedy a friend for 12 years. Mr. Keck knows him as having impecable integrity as a human being, a keen intellect, and a man dedicated to the values of the common person.

40. Peter Turcotte - addressed the Commission on behalf of Judge Israel noting that in his 22 years with the court system, he has seen very few judges stand out to translate law into effective justice. He further stated that experience is crucial to attorneys and to judges and that as a judge, Israel's decisions have always had balance. He indicated that it is refreshng to work with a judge like Judge Israel.

41. Lawrence Sullivan - addressed the Commission on behalf of Kent Willever whom he considers an outstanding candidate. Mr. Willever was one of his students in the Master's Program at Salve Regina College where he found him to be diligent in his studies and in the research of his thesis. He noted that Mr. Williver would bring a needed diversity to the Court.

42. Amy Adler Custas - addressed the Commission on behalf of Lauren Jones noting that she appeared before the Commission in April and submitted a letter on behalf of her attorney, Lauren Jones. She requested that that letter be considered by the Commission in its deliberations to fill the Supreme Court vacancy.

43. Francis Pescosolito - addressed the Commission on behalf of Judge Israel noting that the Judge is well known and respected throughout the mental health community. On behalf of children, those most vulnerable to crime, he urged nomination of Judge Israel whose decisions are consistently well regarded and well respected.

44. David Cicillini - addressed the Commission on behalf of Judge Israel noting that on more occasions than not he is the loser in Judge Israel's courtroom. He indicated that he never thought that Judge Israel had not considered his arguments and studied his briefs and that he is aways certain he is listening and considering his arguments. He further stated that Judge Israel is not reluctant to tackle new legal issues and that he has integrity, is conscientious, fair, and respectful to litigants. Mr. Cicillini noted that the Court needs a member willing to take on new issues and that the decision as to whether trial judge should be elevated should be made by Governor.

45. Joseph Salvatore - addressed the Commission on behalf of William Dimitri whom he has known since l988. He stated that Mr. Dimitri is a mentor whom he greatly respects for his guidance. He further stated that Mr. Dimitri has given him good direction and that he would serve with distinction bringing additional depth and integrity to the Court.

46. Leslie Lopes (Minority Judicial Taskforce) - addressed the Commission on behalf of applicants Israel, Jones, Lovegreen, Dimitri, and MacFadyen. The Taskforce recommends Lauren Jones although Ms. Lopes did not attend the interviews of 6 of the prospective nominees noting that none of those under consideration are minority candidates. She thanked the Commission for extending the deadline to encourage more minority applicants. Ms. Lopes did not attend the interviews of applicants Flanders, Curran, Pfeiffer, Robinson, and Hurst.

47. Anthony Jackvony - addressed the Commission on behalf of William Dimitri whom he has known his entire life and considers part of his family. Both practice law together and have been associates since l980. He stated that Mr. Dimitri understands law and is qualified; possessing the qualities of honesty, integrity, and will uphold the law as a defender of the constitution.

48. Michael McElroy - addressed the Commission on behalf of Lauren Jones whom he has known for 14 years as a co-counsel and as a friend. He noted that Mr. Jones is a unique candidate who is fluent in Spanish. He knows Mr. Jones to be hard-working and knowledgeable with a unique legal mind and as an appellate specialist at 43 years of age.

3. PUBLIC VOTE FILLING JUDICIAL VACANCY.

Mr. Kelly addressed the public relative to the voting procedure adopted by the Commission and filed with the Secretary of State. During deliberations, the Commission considered the materials submitted by each applicant under consideration, input from the public, reports of the Attorney General, the State Police, the Supreme Court Disciplinary Board, and the Rhode Island Ethics Commission.

The results of the public vote are attached as Exhibit A with the nominees to be submitted to the Governor to fill the vacancy in the position of Associate Justice of the Rhode Island Supreme Court are: WILLIAM DIMITRI, JR., LAUREN E. JONES, JOHN A. MAC FADYEN, JUDGE MARK A. PFEIFFER, AND KENT A WILLEVER.

During the public vote, the following recusals were noted: Mr. Kelly and Ms. Gescheidt recused themselves from participating in the vote relative to Judge Israel with Mr. Kelly noting that he has a pending case before him and a prior Ethics Commission complaint lodged against him relative to Judge Israel filed during the last vacancy. Ms. Gescheidt also has a case pending before Judge Israel. Mr. Kelly recused himself from participating in the vote relative to Peter Lawson Kennedy noting a prior business relationship. Ms. Gescheidt recused herself from partcipating in the vote relative to Judge Pfeiffer citing a pending sentencing before him. Mr. Flink recused himself from participating in the vote relative to William Robinson noting that he is a law firm partner of Mr. Robinson and that he would abide by an Ethics Commission ruling prohibiting his voting on this nomination. Mr. Flink further indicated that he would exercise a total of 4 votes during the voting procedure.

Mr. Kelly thanked the Commission members for their attendance and cooperation during the screening process and the public for submitting written and oral comments relative to the applicants under consideration to fill this judicial vacancy.

There being no further business during Public Session, the meeting was ADJOURNED.

Kathleen A. Sousa

Kathleen A. Sousa
Recording Secretary to the
JUDICIAL NOMINATING COMMISSION

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

4

COMPLAINT TO SEARCH AND SEIZE PROPERTY/OR PERSON

ALBERT E. DEROBBIO

To ____________________ Justice of the Supreme, Superior Court, or Judge of the District Court of the State of Rhode Island

a) ____________________ Captain of Police, Smithfield Police Department

b) ____________________ a person authorized by law to bring complaints for violation of the law which it is my responsibility to enforce/a person who has a right to possession of the property stolen, embezzled, or obtained by false pretense or pretenses.

ON OATH COMPLAINS THAT:

(1) Certain property has been stolen or embezzled, or obtained by false pretense, or pretenses, with intent to cheat or defraud within this state or elsewhere;

(2) Certain property has been kept, suffered to be kept, concealed, deposited, or possessed in violation of law, or for the purpose of violating the law;

(3) Certain property is designed or intended for use or is or has been used in violation of law, or as a means of committing a violation of law ;

(4)

and prays that a warrant to search for and seize said property/person be issued and if the same be subject to forfeiture, that the property be forfeited.

**The person/property and articles to be searched for and/or seized is:**

Any typewriter, computer, word processor, printer, typewriter ribbons, computer ribbons, computer discs, computer software, hard drive computer components or any other component or part of any instrument or machine capable of producing a printed document.

**The name of the keeper, thereof (if known) is:**

Arthur D'Amario III

**The place and person to be searched is described as follows:**

11B High Street, Smithfield, Rhode Island, a two story white house located on the southwesterly side of High Street at the intersection of Whitman Street. The house number is 11-13 with two apartments on each side . 11B is on the right side as you face the house .

~~Your complainant prays that said warrant may be served in the daytime and or in the nighttime for the reason that, 24 hour warrant.~~

Subscribed and sworn to before me ; Date:

____________________ Judge/Justice

____________________ Complainant

5

projo.com The Providence Journal

# Archives

Advertising

Providence, Rhode Island







## Laugh and a half; [ALL Edition]

**The Providence Journal**. Providence, R.I.: Aug 8, 1998. pg. A.11

**Full Text** (69 words)

*Copyright Providence Journal/Evening Bulletin Aug 8, 1998*

I've just finished reading your quotes of the comments made by Judge Jeremiah S. Jeremiah after getting caught steering money to his tenants, and I can't stop laughing ("Judge Jeremiah voted for grant for group that rents from him," News, Aug 1.)

If the judge brings his comedy act to the Warwick Musical Theatre, I want two tickets. Maybe he can open for Carrot Top.

ARTHUR D'AMARIO III

Smithfield

Reproduced with permission of the copyright owner. Further reproduction or distribution is prohibited without permission.

Section: *EDITORIAL*

Text Word Count 69

Document URL:

ProQuest Archiver

Copyright © 2006 The Providence Journal Company

Advertising
ENOUGH READING.
CLICK HERE for an unbeatable quote.
QUOTE
suzukiauto.com



Table of Contents

Home page
About Providence
Bulletin Boards
Calendar
DatingCenter
HomeCenter
JobCenter
MoveCenter
Health
Lottery
Massachusetts
Metro
Editorials
Letters
Weblogs
P-Bruins
PC
Red Sox
URI
Horoscope
Movies
Music
Personal Technology

6



COMMONWEALTH OF MASSACHUSETTS

BRISTOL, ss. ATTLEBORO DISTRICT COURT
NO. 9734 RO 0752

DEBRA A. SELLERS, )
Plaintiff )
v. ) 209A HEARING
)
ARTHUR D'AMARIO, III )
Defendant

Honorable John J. Dolan
Attleboro District Court
Attleboro, Massachusetts
October 21, 1997
Total Pages: 25

APPEARANCES:

DEBRA A. SELLERS, Pro Se.

AAA TRANSCRIBING SERVICE, INC.
505 PLEASANT STREET/P.O. BOX 341
MARSHFIELD HILLS, MASSACHUSETTS 02051
1-800-541-8085

6



every time he contacts me I say, I'm going to go and get a restraining order. And I just kind of dismiss it. I don't think he's, he hasn't physically threatened me in any way, shape or form. But I consistently ask him, please do not call me. Please do not write to me. I dated him twice. I'm sorry. I do not want to see you. But he, he's very peculiar.

THE COURT: And how do you know about this record that you say you believe he has, Ma'am?

MS. SELLERS: A friend of mine is a detective in the Rhode Island Police Department. And at the time when I was very concerned about this, after I dated him for those two evenings, he called me from a, it was, not a, it wasn't jail, but it was a correctional facility in Rhode Island. And he was detained there for I think approximately two to three months. And the letters that he mailed me were mailed from there. So I contacted this friend of mine and he did tell me that that's what was going on, that's where he was. I'm very embarrassed to say, I am very, you know, I cannot believe it's happening.

THE COURT: Did you keep any of those letters or?

7

DEFENDANT INFORMATION FORM IN RESTRAINING ORDER CASES (Provided by Plaintiff)

DOCKET NO. – COURT USE ONLY: 9734 RO 0752

TRIAL COURT OF MASSACHUSETTS

DEFENDANT'S NAME: Arthur D'Amario III

DEFENDANT'S DOB: ?

COURT DIVISION: ATTLEBORO

No. 2

ATTENTION: PLEASE PROVIDE AS MUCH INFORMATION AS POSSIBLE. IF A PROTECTIVE ORDER IS ISSUED, THIS INFORMATION WILL HELP POLICE FIND THE DEFENDANT AND SERVE THE DEFENDANT WITH A COPY OF THE ORDER.

OTHER NAMES USED BY THE DEFENDANT:

HOME ADDRESS: 11 High St. Smithfield RI.
Number Street City State Zip

IMPORTANT: Apartment No. ________ Floor No. ________ Name on Door/Mailbox ________

WORK ADDRESS ________
Name of Company / Employer
Number Street City State Zip

Department ________ Title ________

Tel. No. ( ) ________ Work Hours ________

OTHER PLACES DEFENDANT MAY BE FOUND (Friends, bars, relatives, hangouts)

BEST PLACE TO FIND DEFENDANT ________ BEST TIMES ________

DEFENDANT UNDERSTANDS ENGLISH? ☑ Yes ☐ No IF NO, WHAT LANGUAGES?:

DESCRIPTION FOR PURPOSES OF SERVICE ☑ Male ☐ Female ☐ Race ________

Eyes: Brown Hair: Brown Height: 5 7 Weight: 140 Build: med

Other ________ (Beard, glasses, scars, tattoos, acne, hairstyle)

PHOTOGRAPH AVAILABLE? ☐ Yes ☑ No (Photographs are very helpful to police in identifying Defendants.)

MOTOR VEHICLE: License Plate # ________ Year ________ Make: Ford Model: Mustang Color: Red

DOES DEFENDANT HAVE: (describe very briefly)

1. A history of violence towards police officers? ☐ No ☐ Yes
Threatening an officer of the court.

2. A history of using/abusing drugs or alcohol? ☐ No ☐ Yes What kind?

3. Access to guns, a license to carry, or possess a gun? ☐ No ☐ Yes What kind?
Possession of a hand gun — years ago.

4. Psychiatric/Emotional Problems? (Treated/Hospitalized?) ☐ No ☐ Yes What kind?

ANY OTHER INFORMATION WHICH MIGHT BE HELPFUL IN LOCATING THE DEFENDANT

PLAINTIFF'S NAME: Debra Sellers

DATE / / PLAINTIFF'S SIGNATURE

TRUE COPY ATTEST

8

# Commonwealth of Massachusetts
TRIAL COURT OF THE COMMONWEALTH
DISTRICT COURT DEPARTMENT

ATTLEBORO DIVISION

DEBRA SELLERS

vs.

ARTHUR D'AMARIO III

DOCKET # 9734 RO 0752

MOTION

ABUSE PREVENTION ORDER

Now comes the Defendant/~~Plaintiff~~ in the above entitled case and moves this court to ALLOW AN APPEAL OF THE DECISION OF OCT. 29 1997 TO A HIGHER COURT.

for the reason(s) that:

- THERE IS NO JURISDICTION;
- THERE IS NO EVIDENCE OF ABUSE, OR SERIOUS AND IMMINENT HARM.
- THE ACTION IS FRIVOLOUS AND MALICIOUS.
- THE PLAINTIFF LIED UNDER OATH.
- THE COURT RELIED ON HEARSAY EVIDENCE.

[signature] III ARTHUR D'AMARIO III
Defendant/~~Plaintiff~~

The above entitled motion will be heard on NOV. 7, 1997
at 9:00 A.M.
~~XX 2:00 P.M.~~ at the Attleboro District Court, holden at Attleboro.

I hereby certify under the pains and penalties of perjury that on OCT. 29, 1997
(date)
I caused a copy of the above to be mailed, postage paid to: DEBRA SELLERS
Certified Mail/Return Receipt Requested: 19 BLUE JAY WAY: ATTLEBORO

ARTHUR D'AMARIO III [signature] III
Signature

9

# Attleboro Police Department

ARREST - CUSTODY REPORT

## SUPPLEMENTAL

Page 1 of 1 Pages

Defendant D'Amario Arthur

Arrest 97-10-2616 Warrant

Date of Incident 10/31/97

Time of Incident 8;55 PM.

Date of Report 10/31/97

Location 19 Blue Jay Way Attleboro Mass.

On 10/31/97 at approximately 8;55 PM. officer Dufort was detailed back to the station to take a report from a femele subject in the lobby of the station. Upon arrival at the station Dufort met with this female subject who then identified herself to Dufort as Mrs Debra Sellers from 19 Blue Jay Way Attleboro Mass.

At this time Mrs Sellers went onto tell Dufort that she had dated a male subject who name is Arthur D'Amario, she said that this was approximately 18 Month ago, she said that she only dated this subject twice and never had any problem, and hasn't seen him since. Mrs Sellers went onto tell Dufort that she broke it off with him 18 month ago and hasn't heard from him until now.

Mrs Sellers then went onto tell Dufort that she works for Motorola Inc. in Mansfield Mass. and on Oct. 17 of this month, the Human Resource Center the legal Dept. of the company she works for received a letter from this Male subject she dated 18 Months ago. Mrs Sellers told Dufort that the legal Dept. of her company told her and advised her to go to the court house and get a restraining order on this subject Arthur D'Amario from 11 High St. Apt. 8. Smithfield RI. Mrs Sellers told Dufort that she went to the Court House Attleboro District Court and got a Temporary restraining order on Arthur D'Amario which was good until the 29 of Oct.

Mrs Sellers said that on the 29 of Oct. she said that she went to the Attleboro District Court and got a Restraining order No Contact Order granted to her for 1 year by the Judge, and she told Dufort that Mr Arthur D'Amario was persent for the hearing. Mrs Sellers said that on 10/31/97 she received a letter Certified from the Post office Dated Oct. 29 which Mr D'Amario signed and mailed to her of his appeal to a hearing. Mrs Sellers showed Dufort the letter and told Dufort that she wants complant's filled against Mr Arthur D'Amario for violation of the No Contact order issued by Attleboro District Court on Oct. 29 1997 Order Number 9734-RO-0752. Mrs Sellers said that he must have gone right to the Post offic after he received the order and violated the order by mailing the appeal to her. because she had to sign for the certifed mail at the Attleboro Post office. Dufort took copys of the order and a copy of the certified letter for evidence.

Officer Dufort advised Mrs Sellers that he would apply for a Warrant for Arthur D'Amario arrest.

Report Prepared By: Ptlm. J. Dufort

Arresting Officer

White - Original
Yellow - File Copy
Pink - Detectives

10

| COURT DIVISION | Interpreter Required (language:) | DATE & JUDGE | DOCKET ENTRIES |
|---|---|---|---|
| ATTLEBORO | | APR 29 1998 DOLAN | Attorney appointed (SJC R. 3:10); Atty denied & Deft advised per 211D §2A; Waiver of counsel found after colloquy |
| NAME, ADDRESS AND ZIP CODE OF DEFENDANT: Arthur D'Amario, 11 High Street Apt B, Smithfield RI | | APR 29 1998 DOLAN | Terms of release set: PR Bail: Held (276 §58A) See back for special conditions |
| DEFT. DOB AND SEX: UNK 6-9-52 | OFFENSE CODE(S): 955 | APR 29 1998 DOLAN | Arraigned and advised: Potential of bail revocation (276 §58); Right to bail review (276 §58); Right to drug exam (111E §10) |
| DATE OF OFFENSE(S): on or about 10/31/97 | PLACE OF OFFENSE(S): Attleboro | | Advised of right to jury trial: Does not waive; Waiver of jury trial found after colloquy |
| COMPLAINANT: George Bussiere | POLICE DEPARTMENT (if applicable): Attleboro | | Advised of trial rights as pro se (Supp.R. 4) |
| DATE OF COMPLAINT: 11/4/97 | RETURN DATE AND TIME: WARRANT | | Advised of right of appeal to Appeals Ct (R. 28) |

| COUNT-OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT |
|---|---|---|---|---|---|
| A. VIOLATION OF PROTECTIVE ORDER c209A s7 | | | | | WAIVED |

DISPOSITION DATE & JUDGE

DISPOSITION METHOD: Guilty Plea or Admission to Sufficient Facts accepted after colloquy & 278 §29D warning; Bench Trial; Jury Trial; None of the above

FINDING: Not Guilty; Guilty; Not Responsible; Responsible; No Probable Cause; Probable Cause

SENTENCE OR OTHER DISPOSITION: Sufficient facts found but continued without guilty finding until: Probation; Pretrial probation (276 §87) - until: To be dismissed upon payment of court costs / restitution; Dismissed upon: Request of Comm.; Request of victim; Request of Deft; Failure to prosecute; Other: Filed with Deft's consent; Nolle Prosequi; Decriminalized (277 §70C)

FINAL DISPOSITION — JUDGE — DATE: Dismissed on recommendation of Probation Dept.; Probation terminated: defendant discharged

| COUNT-OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT |
|---|---|---|---|---|---|
| | | | | | WAIVED |

DISPOSITION DATE & JUDGE

DISPOSITION METHOD: Guilty Plea or Admission to Sufficient Facts accepted after colloquy & 278 §29D warning; Bench Trial; Jury Trial; None of the above

FINDING: Not Guilty; Guilty; Not Responsible; Responsible; No Probable Cause; Probable Cause

SENTENCE OR OTHER DISPOSITION: Sufficient facts found but continued without guilty finding until: Probation; Pretrial probation (276 §87) - until: To be dismissed upon payment of court costs / restitution; Dismissed upon: Request of Comm.; Request of victim; Request of Deft; Failure to prosecute; Other: Filed with Deft's consent; Nolle Prosequi; Decriminalized (277 §70C)

FINAL DISPOSITION — JUDGE — DATE: Dismissed on recommendation of Probation Dept.; Probation terminated: defendant discharged

| COUNT-OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT |
|---|---|---|---|---|---|
| | | | | | WAIVED |

DISPOSITION DATE & JUDGE

DISPOSITION METHOD: Guilty Plea or Admission to Sufficient Facts accepted after colloquy & 278 §29D warning; Bench Trial; Jury Trial; None of the above

FINDING: Not Guilty; Guilty; Not Responsible; Responsible; No Probable Cause; Probable Cause

SENTENCE OR OTHER DISPOSITION: Sufficient facts found but continued without guilty finding until: Probation; Pretrial probation (276 §87) - until: To be dismissed upon payment of court costs / restitution; Dismissed upon: Request of Comm.; Request of victim; Request of Deft; Failure to prosecute; Other: Filed with Deft's consent; Nolle Prosequi; Decriminalized (277 §70C)

FINAL DISPOSITION — JUDGE — DATE: Dismissed on recommendation of Probation Dept.; Probation terminated: defendant discharged

| COUNT-OFFENSE | FINE | SURFINE | COSTS | RESTITUTION | V/W ASSESSMENT |
|---|---|---|---|---|---|
| | | | | | WAIVED |

DISPOSITION DATE & JUDGE

DISPOSITION METHOD: Guilty Plea or Admission to Sufficient Facts accepted after colloquy & 278 §29D warning; Bench Trial; Jury Trial; None of the above

FINDING: Not Guilty; Guilty; Not Responsible; Responsible; No Probable Cause; Probable Cause

SENTENCE OR OTHER DISPOSITION: Sufficient facts found but continued without guilty finding until: Probation; Pretrial probation (276 §87) - until: To be dismissed upon payment of court costs / restitution; Dismissed upon: Request of Comm.; Request of victim; Request of Deft; Failure to prosecute; Other: Filed with Deft's consent; Nolle Prosequi; Decriminalized (277 §70C)

FINAL DISPOSITION — JUDGE — DATE: Dismissed on recommendation of Probation Dept.; Probation terminated: defendant discharged

ADDITIONAL COUNTS ATTACHED

COURT ADDRESS: 88 N. MAIN STREET, ATTLEBORO, MA 02703

A TRUE COPY — CLERK-MAGISTRATE/ASST. CLERK — ON (DATE)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO.
98 CV 11331 MEL

ARTHUR D'AMARIO III

Plaintiff

v.

JAMES DUFORT
individually and in his official capacity
as Patrolman for the Attleboro Police Department

GEORGE BUSSIERE

individually and in his official capacity
as Patrolman for the Attleboro Police Department

OTHER POLICE OFFICERS OF THE ATTLEBORO POLICE DEPARTMENT
PRESENTLY UNKNOWN
individually and in their official capacity

AMENDED COMPLAINT/
JURY DEMAND

PARTIES

1. Plaintiff is a resident of Smithfield, Rhode Island.

2. Defendant Dufort is police officer with the Attleboro Police Department, Bristol County, Massachusetts. Defendant Bussiere is a police lieutenant with the Attleboro Police Department.

JURISDICTION AND VENUE

3. Venue is appropriate to this judicial district pursuant to 28 U.S. Code, §1391(a) as this is the judicial district in which the

cause of action arose because substantially all if not all of the events and omissions giving rise to this claim occurred here.

4. Jurisdiction is appropriate to this Court pursuant to 28 U.S. Code s. 1331 and 1334. This is an Action for damages pursuant to 42 U.S. Code s. 1983 and s. 1988 for violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

## STATEMENT OF FACTS

5. On or about 29 October 1997, the Attleboro District Court issued a M.G.L.c. 209A restraining order against the Plaintiff, Mr. D'Amario.

6. The restraining order clearly provided at paragraph 2:

> YOU ARE ORDERED NOT TO CONTACT THE PLAINTIFF [Ms. Debra Sellers], except ... for notification of court proceedings ... Notification of court proceedings is permissible only by mail, or by sheriff or authorized officer when required by statute or rule. (emphasis added).

7. On or about 29 October 1997, Mr. D'Amario filed a notice of appeal from the issuance of the restraining order. As required by the service requirements of the District Court and as allowed by the restraining order, Mr. D'Amario mailed a copy of the notice of appeal to Mrs. Sellers by certified mail on that same date.

8. On or about 31 October 1997, after receiving service of the

notice of appeal, Ms. Sellers went to the Attleboro police department and complained to Defendant Dufort "she received a letter Certified [sic] from the Post Office Dated [sic] Oct. 29 which Mr. D'Amario signed and mailed to her of his appeal to a hearing." Ms. Sellers showed Defendant the letter and told the Defendant that she wanted Mr. D'Amario arrested for violation of the restraining order. Defendant "took copys [sic] of the order and a copy of the certified letter for evidence. These quotes are taken directly from the Defendant's Arrest Report.

9. Despite the clear language of the restraining order allowing and in fact requiring notification of court proceedings as an exception to the restraining order, the Defendants Dufort and Bussiere willfully and knowingly with the assistance of other officers presently unknown went on to obtain an arrest warrant for the Plaintiff by negligently, recklessly, willfully, or knowingly and in bad faith ignoring the exceptions in the restraining order and not making these exceptions known to whomever issued the warrant. Defendant Bussiere complained under oath on or about 4 November 1997 that the Plaintiff violated the above referenced 209A restraining order resulting in the issuance of a summons and complaint against the Plaintiff.

10. As a result of the warrant issued for the Plaintiff's arrest, Plaintiff shortly after he became aware of its existence voluntarily appeared at the offices of Attleboro Police on or

about 29 April 1998. He was arrested and imprisoned for over two hours in a prison cell. He was then taken while in handcuffs to an arraignment and released on personal recognizance.

11. Subsequently, after he returned home on 29 April 1998, the Smithfield, Rhode Island police were waiting at his home to arrest him on the same arrest warrant. These police held the Plaintiff under arrest and in forced custody at his home for over 30 minutes while they called the courthouse to confirm Mr. D'Amario's explanation that he had been arraigned and released on the warrant. The case was subsequently dismissed at the pre-trial conference stage of the criminal proceedings.

COUNT I - 42 U.S. Code s. 1983 and s. 1988

12. Plaintiff incorporates by reference para. 1 - 11 set forth above.

13. The Defendants at all times material to this Action were acting under color of the statutes, ordinances, regulations, policies, customs, and usage of the Commonwealth of Massachusetts.

14. Defendants' acts violate 42 U.S. Code s. 1983 and s. 1988 and are a violation of the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

COUNT II - The Massachusetts Civil Rights Act

15. Plaintiff incorporates by reference para. 1 - 11 set forth above.

16. Defendants' acts are a violation of Massachusetts General Law, Chapter 12, s. 11(i).

COUNT III - FALSE IMPRISONMENT/EMOTIONAL DISTRESS

17. Plaintiff incorporates by reference para. 1 - 11 set forth above.

18. Defendants' acts constitute false imprisonment which further constitutes extreme and outrageous conduct that has caused the Plaintiff severe emotional distress.

19. The above referenced acts constitute negligent infliction of emotional distress with resulting physical injuries.

COUNT IV - MALICIOUS PROSECUTION

20. Plaintiff incorporates by reference para. 1 - 11 set forth above.

21. Defendants' acts constitute malicious prosecution.

WHEREFORE, Plaintiff requests that the Court grant relief as follows:

1. Compensatory damages;

2. Punitive damages;

3. Costs of this Action, including reasonable attorneys' fees pursuant to 42 U.S.C. §1988;

5. Such other relief as the Court deems appropriate.

PLAINTIFFS DEMAND TRIAL BY JURY ON ALL ISSUES.

Plaintiff
by his attorney,

Valeriano Diviacchi, BBO #555940
Diviacchi Law Office
470 Atlantic Ave Suite 1100
Boston, MA 02210-2208
(617) 542-3175

DATED: 12/14/98

I HEREBY CERTIFY THAT TRUE COPY OF THE ABOVE WAS SERVED UPON ALL ATTORNEYS OF RECORD BY MAIL/FAX/HAND ON 12/14/98

CLOSED

**United States District Court**
**District of Massachusetts (Boston)**
**CIVIL DOCKET FOR CASE #: 1:98-cv-11331-MEL**
**Internal Use Only**

D'Amario v. Dufort, et al
Assigned to: Senior Judge Morris E. Lasker
Demand: $0
Case in other court: 02-01076
Cause: 28:1331 Federal Question: Other Civil Rights

Date Filed: 07/09/1998
Date Terminated: 02/01/2001
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Arthur D'Amario, III**

represented by **Arthur D'Amario, III**
Federal Detention Center
#22667-038
P.O. Box 562
Philadelphia, PA 19105
PRO SE

**Valeriano Diviacchi**
Diviacchi Law Office
1A
111 Beach Street
Boston, MA 02111-2532
617-542-3175
Fax: 617-542-3110
Email: val@diviacchi.com
*TERMINATED: 05/22/2000*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**James Dufort**
*individually and in his official capacity as Patrolman for the Attleboro Police Department*

represented by **John J. Cloherty, III**
Pierce, Davis, Fahey & Perritano, LLP
Ten Winthrop Square
Boston, MA 02110
617-350-0950
Fax: 617-350-7760
Email: jcloherty@piercedavis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**John J. Davis**
Pierce, Davis & Perritano, LLP

Ten Winthrop Square
Boston, MA 02110-1257
617-350-0950
Fax: 617-350-7760
Email: jdavis@piercedavis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd M. Reed**
Edwards Angell Palmer & Dodge LLP
2800 Financial Plaza
Providence, RI 02903
401-274-9200
Fax: 401-276-6611
Email: treed@EdwardsAngell.com
*TERMINATED: 06/14/1999*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Other Police Officers of The Attleboro Police Department Presently unknown**
*individually and in their official capacity*

represented by **John J. Davis**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Todd M. Reed**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 07/09/1998 | 1 | Complaint filed. Case assigned to Judge: Lasker. Receipt #: 7575 Amount:$ 150.00. Fee Status: Paid (sad) (Entered: 07/09/1998) |
| 07/15/1998 | 2 | Amended complaint by Arthur D'Amario III filed. (Answer due 7/25/98 for Other Police Officer, for James Dufort ) . Amended complaint amends [1-1] complaint ; and jury Demand. (sad) (Entered: 07/15/1998) |
| 08/12/1998 | 3 | Return of service executed as to James Dufort with service on 7/30/98 filed. (fmr) (Entered: 08/12/1998) |
| 08/12/1998 | 4 | Return of service executed as to Other Police Officer with service on 7/28/98 filed. (fmr) (Entered: 08/12/1998) |
| 08/20/1998 | 5 | Notice of appearance of attorney for James Dufort, Other Police Officer by John J. Davis, Todd M. Reed, filed. (sad) (Entered: 08/25/1998) |
| 08/20/1998 | 6 | ASSENTED TO Motion by James Dufort, Other Police Officer to extend time to 9/8/98 to respond , filed. (sad) (Entered: 08/25/1998) |
| | | |

| | | |
|---|---|---|
| 05/22/2000 | | Judge Morris E. Lasker . Endorsed Order entered granting [27-1] motion for Valeriano Diviacchi to withdraw as attorney (Terminated attorney Valeriano Diviacchi for Arthur D'Amario III denying [32-1] motion to dismiss . [EOD Date 5/23/00] cc/cl (jdj) (Entered: 05/23/2000) |
| 05/31/2000 | 34 | Notice of attorney's lien by Valeriano Diviacchi , filed. (sad) (Entered: 05/31/2000) |
| 06/01/2000 | 35 | Letter by Arthur D'Amario III dated: 5/26/00 to: David Galluzzi re: Release date filed. (mgl) (Entered: 06/02/2000) |
| 11/29/2000 | 36 | Judge Morris E. Lasker . Notice of Hearing/conference: set status conference for 2:15 12/14/00 cc/cl. (ghh) (Entered: 11/30/2000) |
| 12/14/2000 | 37 | Judge Morris E. Lasker . Notice of Hearing/conference: reset status conference for 2:30 1/30/01 cc/cl . (ghh) (Entered: 12/15/2000) |
| 12/20/2000 | 38 | Judge Morris E. Lasker . Notice of Hearing/conference: Motion hearing set for 2:30 1/30/01 for [32-1] motion to dismiss . cc/cl and pltf (ghh) (Entered: 12/20/2000) |
| 01/30/2001 | | Motion hearing re: [28-1] motion to enforce settlement agreement (jdj) (Entered: 02/07/2001) |
| 01/30/2001 | 41 | Judge Morris E. Lasker . Clerk's Notes: re: motion hearing held:Testimony of plainiff and his former attorney Mr Diviacchi heard. After hearing the parties have agreed that the settlement agreement in question only applied to the events which gave rise to the case. Accordingly defendants counsel was instructed to draft a settlement agreement and release which reflects this agreement. The clerk is instructed to enter a 60 day order. (jdj) (Entered: 02/07/2001) |
| 02/01/2001 | 39 | Judge Morris E. Lasker . Settlement Order of Dismissal entered.copies to counsel and pltf. [EOD Date 2/1/01] (ghh) (Entered: 02/01/2001) |
| 02/01/2001 | | Case closed. (ghh) (Entered: 02/01/2001) |
| 02/01/2001 | 40 | Notice of proposed release by Arthur D'Amario III by John J. Cloherty , filed. (jdj) (Entered: 02/02/2001) |
| 02/07/2001 | 42 | Letter from Judge Lasker dated: 2/7/01 to: Counsel re: Proposed Release of 1/31/01 filed. (jdj) (Entered: 02/08/2001) |
| 02/16/2001 | | General Release sent to Pltf D'Amario with self address envelope to return to court after signing. (ghh) (Entered: 02/16/2001) |
| 02/27/2001 | | General Release returned signed and filed. (ghh) (Entered: 02/27/2001) |
| 04/02/2001 | | Terminated document: terminating [32-1] motion to dismiss, terminating [28-1] motion to enforce settlement agreement, terminating [27-1] motion for Valeriano Diviacchi to withdraw as attorney, terminating [19-1] motion for summary judgment, terminating [18-1] motion for leave to file motion for summary judgment, terminating [16-1] motion for entry of default as to James Dufort, Other Police Officer, terminating [6-1] motion to extend time to 9/8/98 to respond Requested by ghh. (ghh) |

13

# Attleboro Police Department

COPY

INCIDENT REPORT

| Record # | Inc. Code | Geocode |
|---|---|---|
| 99011354 | 2002 | 52 |
| Arrest # | ☒ Initial Report<br>☐ Follow-up Report | |

| Incident | Location |
|---|---|
| Possible Restraining Order Violation | 19 Blue Jay Way |

| Date & Time Occurred | Date & Time Reported | Date & Time of this Report | Check if more ☐ Names in supplement |
|---|---|---|---|
| 01/15/99 1528 | 01/15/99 1528 | 01/15/99 1600 | |

Codes in below box marked "Code", I-Involved Participant, W-Witness, P-Parent, Rp-Reporting Party, DC-Discover crime

| Code | Principal Party's(or firm) Name (last, First, M | Residence Address | Residence Phone |
|---|---|---|---|
| V | Sellers, Doborah | 19 Blue Jay Way Attleboro, Ma 02703 | 226-7346 |

| Occupation, I.D. | Sex | Race | Age | D.O.B. | Business Address | Business Phone |
|---|---|---|---|---|---|---|
| | F | W | | | | |

| Code | Principal Party's(or firm) Name (last, First, M | Residence Address | Residence Phone |
|---|---|---|---|
| I | | | |

| Occupation, I.D. | Sex | Race | Age | D.O.B. | Business Address | Business Phone |
|---|---|---|---|---|---|---|
| | | | | | | |

| Code | Principal Party's(or firm) Name (last, First, M | Residence Address | Residence Phone |
|---|---|---|---|
| I | | | |

| Occupation, I.D. | Sex | Race | Age | D.O.B. | Business Address | Business Phone |
|---|---|---|---|---|---|---|
| | | | | | | |

| Suspect # 1 (last,first,M) | Sex | Race | Age | Hgt. | Wgt. | Date of Birth | Arrested ☐ Y, ☐ N |
|---|---|---|---|---|---|---|---|
| Address, clothing & other identifying marks and characteristics | | | | | | S.S. # | Complexion |

| Suspect # 2 (last,first,M) | Sex | Race | Age | Hgt. | Wgt. | Date of Birth | Arrested ☐ Y, ☐ N |
|---|---|---|---|---|---|---|---|
| Address, clothing & other identifying marks and characteristics | | | | | | S.S. # | Complexion |

| Veh. Color | Year | Make | Model | Style | Reg # | Vin # | Disposition | TT. Sent ☐ |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| Point of Entry N/A Area N/A Lock N/A<br>Exit Different ☐ | Type of Entry N/A | Property Description In supplement ☐ |
|---|---|---|

Narrative

Ms Sellers has a restraining order against Mr. Arthur D'Amario. Mr. D'Amario is presently on probation for previously violating the restraining order. Ms. Sellers received a greeting card at halloween which was placed in her mail box, the card was not postmarked. The card and envelope were processed by the Middleboro State Police I.D. Unit, No readable fingerprints were found. The envelope to the card was addressed with a typewriter and typed, in all capitol letters.Today Ms. Sellers received a birthday card, her birthday is Sunday, 1/17/99. This card is also addressed by the use of a typewriter using all Capital letters. This card is post marked Providence Jan. 14th,1999. Mr, D'Amario is a Smithfield R.I. resident.Both cards appear as though they may have been typed using the same typewriter. Ms. Sellers and this investigator both feel that both these cards most probably were from Mr. Arthur D'Amario. The most recent card will also be submitted to Middleboro State Police I.D. Unit for processing.

| Case Status | | Complainant's Signature |
|---|---|---|
| ☒ Active<br>☐ Inactive<br>☐ Unfounded<br>☐ Cleared | I hereby certify that the contents of this report are true and Correct to the best of my knowledge.<br>Sgt. Kenneth D Collins<br>Reporting Officer: Signature: | |

14

SUMMONS FOR WITNESS

District Court Department

SESSION: ☒ CRIMINAL ☐ JUVENILE ☐ JURY ☐ MAGISTRATE HEARING

NAME, ADDRESS AND ZIP CODE OF DEFENDANT

Arthur D'Amario
11 High Street
Smithfield, RI. 02917

NAME AND ADDRESS OF COURT DIVISION

Attleboro District Court
88 North Main Street
Attleboro MA 02703

YOU MUST APPEAR AT THIS COURT ADDRESS ON THE DATE AND TIME SPECIFIED HEREIN

DATE AND TIME OF APPEARANCE

2/4/99 AT 9:00A.M. M.

DATE TIME

NAME, ADDRESS AND ZIP CODE OF WITNESS

OFFENSE(S)

Alleged Violation Of Probation

To the above named ☒ Defendant ☐ Witness:

You are hereby ordered to appear in this Court on the appearance date noted above

☒ To answer to a criminal complaint charging you with the offense(s) listed above.

☐ To give evidence and testify on behalf of the ☐ Commonwealth ☐ Defendant in the matter described above, and to appear from time to time and day to day thereafter as ordered. You are further required to bring with you:

PROBATION SUMMONS

ANY QUESTIONS REGARDING THIS

SUMMONS CONTACT

P.O. J. Wordell, PO ext 338

Attleboro

| WITNESS: FIRST JUSTICE | DATE OF ISSUE | CLERK-MAGISTRATE |
| --- | --- | --- |
| Hon. John J. Dolan | 1/14/99 | Daniel J. [signature] |

WARNING TO DEFENDANT OR WITNESS:

Failure to appear in accordance with this summons may result in the issuance of a warrant for your arrest. Please bring this document with you to court.

ATENCION:

Esta es una notificación oficial de la corte.
Si usted no sabe leer inglés, obtenga traducción!

15

COPY

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR A SEARCH WARRANT

I, Kenneth D Collins am a Police Officer in the City of Attleboro, Massachusetts. I have been employed as a Police Officer in the City of Attleboro for twenty-four (24) years. I have been assigned to the Detective Division of the Attleboro Police Department for seventeen (17) years. I presently hold the rank of Detective Sergeant. I am presently the Commander of the Attleboro Police Department Detective Division and have been so assigned for the past eleven (11) years. I have personally conducted hundreds of criminal investigations throughout my career as a Police Officer. I have also been charged with overseeing hundreds of criminal investigations conducted by my subordinates over the past eleven- (11) years. I have attended numerous courses of study related to criminal Investigations and Investigative techniques, including Narcotics investigations. The Massachusetts Criminal Justice Training Council, The Federal Bureau of Investigations, The Federal Drug Enforcement Administration and The Bristol County District Attorney's office, conducted these courses. I have also attended numerous seminars relative to criminal investigations sponsored by various police departments throughout the Commonwealth of Massachusetts. I have a Masters Degree in Criminal Justice. In my pursuit of a Masters degree I was required to take several courses in Psychology, Human Behavior, Behavior of Social Deviates, as well as Criminal Justice Courses.

In March of 1998 This affiant became involved in an investigation involving a failed relationship between Mr. Arthur D'Amario III and Ms. Debra A Sellers. Mr. D'Amario and Ms. Sellers met in July of 1996 they dated once and Mr. D'Amario attended a family cookout with Ms. Sellers. Ms. Sellers then decided she no longer wished to date Mr. D'Amario. Mr. D'Amario continued to phone and write letters to Ms. Sellers despite the fact she repeatedly asked him not to contact her. Ms Sellers exhausted all avenues she could think of to end her relationship with Mr. D'Amario. Mr. D'Amario simply would not leave Ms. Sellers in peace.

Mr. D'Amario harassed Ms. Sellers at home, and at work, by phone, and through the mail. D'Amario wrote to Ms. Sellers, he wrote to her former husband complaining about her, and he wrote to her mother complaining about her, and he wrote to her employer complaining about her. Mr. D'Amario did everything he could to make Ms. Seller's life miserable. Ms. Sellers applied for and was granted an Abuse Prevention Order by the Attleboro District Court. Mr. D'Amario violated the Abuse Prevention Order twice. He used his PRO SE status as a vehicle to send messages to Ms. Sellers asking her to meet with him. He would mail what he alleged to be legal motions to officials at the Attleboro Court. He would also mail a copy of his motion to Ms. Sellers; within his motion would be a message for Ms. Sellers to contact him. Mr. D'Amario was charged with the violations of the Abuse Prevention Order. On November 05, 1998 Mr. D'Amario appeared in Attleboro District Court for arraignment on charges alleging that he violated The Abuse Prevention Order. On December 17, 1998 Mr. D'Amario admitted sufficient facts to the violations of the Abuse Prevention Order. Mr. D'Amario received a sentence of eighteen months in the House of Correction, 37 days committed, the balance suspended with probation until June 11, 2001.

Ms. Sellers received a Halloween Card in her mailbox a couple days prior to Halloween, 1998. The envelope was stamped but not postmarked. This lead Ms. Sellers and this affiant to believe its sender placed the card in the mailbox. The envelope was typewritten in all capitol letters, the card read " Here's a little mystery- can you find a clue to solve the case of who it is who sends this card to you? I'm not going to sign my name or make a single mark- I'll just say happy Halloween... and leave you in the dark!" The envelope was type printed in all capitol letters; the address was centered on the envelope and double-spaced between lines. State Police processed the card and envelope, no readable fingerprints were found.

On January 15, 1998 Ms. Sellers contacted this affiant. Ms. Sellers stated that she had received an anonymous birthday card in the mail. Ms. Sellers and this affiant noted that this card was very similar in

COPY

15

appearance to the Halloween card Ms. Sellers received in October. The envelope was typewritten in all capitol letters. The address was centered on the envelope and double-spaced between lines. Both cards were Gibson greeting cards. The birthday card read " Hope you'll open your eyes to a bright, cheery day, The kind that brings blue skies and sunshine your way... For someone as special and caring as you Deserves to be happy your whole life through! This card had a typed message inside bottom " To a very beautiful Women Happy Birthday 63." Note: Nineteen Sixty-three is the year Ms. Sellers was born a fact which is known to Arthur D'amario.

Ms. Sellers stated that prior to her contact with Mr. D'Amario she has never received anonymous greeting cards. It should be noted here that throughout this ordeal Mr. D'Amario has shown extreme mood swings in his writings. He refers to Ms. Sellers in a derogatory manner, and then in the same letter he talks about how much he adores her. He often refers to her in his letters as cute or beautiful, as does the author of the anonymous birthday card. Greeting cards by nature are a very personal way to convey your feelings to someone, to remain anonymous defeats the purpose of the card. You send someone a greeting card to let him or her know you are thinking of him or her on a special occasion. If the Halloween card stood alone one could argue that the sender forgot to sign it, however the Halloween card, supported by the birthday card, shows the sender obviously intended to conceal their identity. A typewritten message in a greeting card is very impersonal. One who cares enough about someone to send them a greeting card, particularly a birthday card, most always adds a personal handwritten note to the preprinted message of the card to personalize the message. A typewritten message in this instance shows, the sender took the time to type a message, most probably to avoid having their handwriting recognized. The sender intentionally left the card unsigned. The purpose of these cards was not to wish Ms. Sellers a happy Halloween or a happy birthday. The purpose of these cards was to cause Ms. Seller's duress, which they did. The only person Ms Sellers knows who would like to cause her concern and duress is Arthur D'Amario. Mr. D'amario is also the only person Ms. Sellers knows who would have a good reason to leave the cards unsigned. Ms. Sellers has an active abuse prevention order against D'Amario, which he has violated two previous times.

Mr. D'Amario was incarcerated at The Adult Correction Institution in Cranston Rhode Island for a period of time in 1996. During this time period Mr. D'Amario wrote several letters to Ms. Sellers, which were hand printed and signed by him. In a letter dated August 17, 1996, Mr. D'Amario adds a postscript that reads " I've printed because you'd never be able to read my sloppy handwriting. I miss my Smith-Corona! "See attached addendum which is incorporated herein by reference." It is also noted that Smith-Corona is a major brand Typewriter manufacturer.

Mr. D'Amario is a frequent Pro Se litigant in the Rhode Island Court System, the Federal Court system and most recently frequent Pro Se litigant in The Massachusetts Court System. Mr. D'Amario's Pro Se legal filings, motions, etc. are type written, apparently by him and signed by him. This affiant has probable cause to believe that Mr. D'Amario owns a typewriter or other mechanical or electrical devise capable of producing print similar to that on the Halloween and birthday cards received by Ms. Sellers.

This affiant spoke with Mr. Allen Robbilard. Mr. Robbilard is a Qualified Expert Document Analyst. Mr. Robbilard advised this affiant that there are numerous methods of scientifically linking a document to the instrument that produced it. Mr. Robbilard advised this affiant that if, in fact the instrument is a typewriter of the cloth ribbon type, the entire message could be imprinted on the ribbon. A carbon ribbon may leave print that can be matched. Spacing and other unique characteristics can result in a positive match between a document and the instrument that produced the document. A computer may still have pertinent document information stored in memory. Based on this affiants conversation with Mr. Robbilard it was determined that the type of instrument which produces a specific printed document can not be determined unless an expert examines both the document and the Instrument that produced the printed document. It is for that reason that this affiant is requesting that a Search Warrant be issued for the home of Arthur D'Amario III to seize any and all instruments that are capable of producing a printed (lettering) type document. Items to be seized include but are not limited to typewriters, computers, word Processors, printers, typewriter ribbons,

15

COPY

computer discs, software and any other component or part of an instrument capable of producing a printed document.

Mr. D'amario is unemployed, he collects disability and he lives alone. It is reasonable to conclude that since Mr. D'Amario does not work outside the home he prepares the lengthy court filings previously referred to in the comfort of his home. Mr. D'Amario as recently as January 13, 1999 filed a four page typewritten Civil Action in The Attleboro District Court " See attached addendum which is incorporated herein by reference." This document contains print similar in appearance to that observed on the greeting cards Ms. Sellers received on Halloween and her birthday. An instrument which produces print is a nonperishable product, which usually affords the user many years of service. Such an instrument is not often discarded or disposed of unless it is damaged beyond repair. Based on the clarity and sharpness of this most recent document it is reasonable to believe that this instrument is in good working order. It is further reasonable to believe that this instrument is still in the possession of Mr. Arthur D'Amario at 11B High Street Smithfield Rhode Island.

This affiant has probable cause to believe that Mr. Arthur D'Amario possesses an instrument capable of producing print (lettering) the same type as that observed on an unsigned Halloween card and an unsigned birthday card received by Ms. Debra Sellers. Mr. Arthur D'Amario is the only person who has good reason (an abuse prevention order) to conceal his identity from Ms. Sellers. Ms. Sellers knows no one, other than Arthur D'Amario, who would send her a greeting card, taking pains to conceal their identity. Ms. Sellers has never received anonymous greeting cards prior to obtaining an abuse prevention order against Mr. Arthur D'Amario. This affiant further has probable cause to believe that the previously mentioned print (lettering) producing instrument is located at the home of Arthur D'Amario. Mr. D'Amario lives at 11B High Street Smithfield, Rhode Island.This affiant has probable cause to believe that examination of said instrument will confirm that this instrument is the instrument that produced said print. If infact it is confirmed that Mr. D'Amario possesses the print producing instrument which addressed the cards received by Ms. Sellers. Mr. D'Amario would be in violation of his probation, and he would, for the third time, be in violation of an Abuse Prevention Order issued by the Attleboro District Court.

This affiant respectfully requests that a Search Warrant be Issued for The apartment of Arthur D'Amario III 11B High Street Smithfield Rhode Island.

Printed Name of Applicant

Kenneth D Collins

Signed under the penalties of perjury

X

Sworn and subscribed to Before

X

Signature of Justice, Clerk Magistrate or Assistant Clerk

2/8/99

Date

ALBERT E. DEROBBIO

16



REFERENCE: 99-118-OF
OFFICER: Capt. Catlow, Gregg L.

WITNESS STATEMENT

Time: 11:00

Date: 2/9/99

Place: Smithfield P.D.

I, Captain Gregg L. Catlow, voluntarily and without threats or promises, make the following statements:

Q. What is your name?

A. Gregg L. Catlow

Q. What is your present address?

A.

Q. What is your date of birth?

A.

Q. What is your occupation?

A. Police Officer
Smithfield, RI 231-2500

On Monday 2/8/99, I received a call from Sergeant Kenneth Collins of the Attleboro Police reporting that they were investigating Arthur D'Amario of 11B High Street, Smithfield, for violating a Massachusetts Protection from Abuse Order. Sergeant Collins reported that Mr. D'Amario is apparently typing letters to his victim and that he would like to obtain Search Warrant for his residence to seize the typewriter.

Sergeant Collins into the station with an affidavit. Based on his affidavit, a search warrant was drawn and subsequently signed by District Court Judge Albert DeRobbio.

11:40 a.m., we responded to 11B High Street accompanied by Sergeant Richard St.Sauveur, Patrolman Michael Mousseau, and Patrolman David Parenteau. We were permitted entrance by Arthur D'Amario. He was provided a copy of the search warrant. On the kitchen table was a Smith Corona model XD4900 word processor. Sgt. Collins searched for used cartridges for the word processor and found one in the trash. A short time into the search he called me into the bedroom where he located a Raven Arms .25 semi-automatic handgun. Sergeant St. Sauveur photographed the gun and a box of ammunition. Knowing the Arthur D'Amario was currently the defendant in a Massachusetts Protection from Abuse Order, I seized the gun and the ammunition.

12:15 p.m., we cleared 11B High Street. I personally provided Arthur D'Amario a copy of the search warrant and a list of items seized.

Thursday 2/11/99, I spoke with the supervising agent at ATF with regard to a Federal charge of possession of a firearm while subject to a Domestic Abuse Restraining Order. He stated that a minimum requirement is that the parties would have to have been intimate within the last three months. At

16

02/24/1999

OFFICER'S NARRATIVE REPORT
Smithfield Police Department



REFERENCE: 99-118-OF
OFFICER: Capt. Catlow, Gregg L.

this time, the facts do not exist.

I spoke with William Ferland, Chief of the Criminal Division for the Department of Attorney General. He requested that we send a copy of the case to him because Mr. D'Amario is a probation violator.

Friday 2/12/99, I received a call from Attorney General Ferland reporting that a Superior Court warrant has been signed for Arthur D'Amario for Probation Violation.

Capt. Gregg L Catlow

17

**Forensic Science Applications**
Examination of Questioned Documents

COPY

# REPORT

**TO:** Sergeant Kenneth Collins
Attleboro Police Department
12 Union Street
Attleboro, Massachusetts 02703

**DATE:** February 26, 1999

FSA #907 and 907A

**RE:** Arthur D'Amario-
Typewriter Examination

**CONTRIBUTOR CASE #**

**EVIDENCE RECEIVED:** From Sgt. Kenneth Collins on February 12, 1999 at Attleboro, Massachusetts and via U.S. Postal Service certified mail on February 22, 1999

**Specimens:**

Specimens Received February 12, 1999

| | |
|---|---|
| Q1 | One (1) used Smith Corona correctable typewriter ribbon |
| Q2 and Q3 | One (1) envelope addressed to "Debbie Sellers……." And accompanying Halloween card |
| Q4 and Q5 | One (1) envelope addressed to "Miss Deb Sellers……." postmarked Jan. 14, 1999 and accompanying birthday card |
| K1 | One (1) Smith Corona typewriter model #5A-1 with ribbon cartridge and correcting tape cassette |
| Also submitted: | -open box containing five (5) Smith Corona correctable film ribbons<br>-open box containing two (2) Smith Corona lift-off correcting cassettes |

17

COPY

Specimens Received February 22, 1999

K2 Numerous original and photocopied typewritten letters and envelopes known to have been sent by Arthur D'Amario

**RESULTS OF EXAMINATION**

The typewritten text which appears on specimens Q2, Q4 and Q5 is not present on the Q1 typewriting ribbon which was found in the trash during the search of Arthur D'Amario's residence or on the ribbon removed from the K1 typewriter.

The style of typewriting on specimens Q2, Q4 and Q5 is different from the style of type produced by the K1 typewriter using the printwheel that was in the machine at the time it was seized. The style of typewriting on specimens Q2, Q4 and Q5 is different from any style that is commonly used in a Smith Corona machine, such as K1. The style of typewriting present on the K2 documents is consistent with the style on the Q1 ribbon and the K1 ribbon;therefore, the machine that produced these documents did not produce the Q2, Q4 and Q5 typewriting.

No indented writing was detected on specimens Q2 through Q5. One machine-produced indentation was noted on specimen Q5, and a lift of this indentation is being provided to you with the evidence. It is not known if this impression was made during the manufacturing process or if it was made when the Q5 card was inserted through the roller of a typewriter.

The U.S. postage stamps present on specimens Q2 and Q4 have torn edges that could be compared to other stamps that may become available to you. No stamps on the original envelopes contained in specimen K2 are like those on specimens Q2 and Q4.

The glue lines, as well as the stamps on specimens Q2 and Q4 are the type that have to be moistened for adherence; and, therefore, may contain DNA substance from the person who wet them. DNA profiles, if present, on these specimens, could be compared to DNA that may be present on the K2 envelopes.

Specimens Q4 and Q5 do not appear to have been processed for latent fingerprints. You should contact the DNA laboratory prior to having any fingerprint examinations done to see whether they prefer to do their analysis prior to fingerprint processing.

Case 1:06-cr-00112-PSD Document 119 Filed 10/11/2006 Page 21 of 22

17

COPY

## ADMINISTRATIVE

Specimens Q1 through Q5, K1 and K2, as well as the Also Submitted items are being personally delivered to your office at the Attleboro, Massachusetts Police Department. It is noted that the ribbon presently in the K1 typewriter was used to make known typewriting exemplars for examination purposes and was one of the ribbons received in the Also Submitted items.

Alan T. Robillard

18

# Memorandum

**To:** File

**CC:** Arthur D'Amario

**From:** ECR

**Date:** May 20, 1999

**Subject:** United States vs. Arthur D'Amario

On May 18, 1999, ECR met with Alan Robillard, who has a consulting business called Forensic Science Applications. Mr. Robillard was consulted by the Attleboro Police Department in connection with both issuance of the search warrant that resulted in the seizure of the gun in Arthur D'Amario's apartment as well as the analysis of the materials that were found in connection with the search, other than the gun. Mr. Robillard remitted the following to ECR, that he had been consulted by Detective Sergeant Collins of the Attleboro Police Department, who had been referred to Alan Robillard by the Bristol County DA's Office. Basically, Sergeant Collins wanted to know how you can identity an anonymous letter and there is a certain protocol which is applied. Mr. Robillard indicated to Sergeant Collins ahead of time that the likelihood of matching type was pretty slim. An analysis would depend on the evidence. If there was a cloth ribbon that was used in the typewriter there would be a small chance that you could find the typewritten message on the cards in question on the cloth ribbon. He needed to see the

documents as well as the typewriter ribbon. He needed to see the documents as well as the typewritten ribbon. He needed to see the typewriter with the ribbon a ribbon that had been found in the trash and several melon samples of Arthur D'Amario's typing. Mr. Robillard did indicate that he could have made an analysis based on upon the cards and the melon samples of Arthur D'Amario's writing, however, to make it conclusive, he would have needed the typewriter ribbons. Mr. Robillard did indicate that there was only tiny possibility the cloth ribbon have the message on it. He indicated that the statements made by Collins in the affidavit were the reverse of what is actually true regarding the ribbon and the carbon. A carbon would have a message, a cloth ribbon would not. He did indicate in the meeting that Collins was concerned chiefly with typewriting and in fact had identified the card as having typewriting on it. He did not mention a computer or bubblejet printer type of printing. He was concerned with typewriting. This would be relevant in terms of the search warrant where they had sought computer information when they had no evidence that a computer was in fact used in connection with the cards. Finally, ECR reviewed with him the statements at the end of the affidavit in which he mentions that there is probable cause that the typewriter that was to be ceased would have been the source of the typing on the cards and he said that there was no evidence of that prior to the issuance of the search warrant.

ECR/slc

19

# The Commonwealth of Massachusetts
## Department of State Police
## Office of the Chief Legal Counsel

470 Worcester Road
Framingham, MA 01701

November 3, 2006

MITT ROMNEY
GOVERNOR

KERRY HEALEY
LIEUTENANT GOVERNOR

ROBERT C. HAAS
SECRETARY

COLONEL MARK F. DELANEY
SUPERINTENDENT

Arthur D'Amario 02989-070
Federal Detention Center
P.O. Box 562
Philadelphia, Pennsylvania 19105

RE: *Your Request for Records*

Dear Mr. D'Amario:

Your request, which was directed to our Crime Scene Services Section, has been forwarded to this office for response.

The Crime Scene Services Section has advised us there are no records responsive to your request.

Sincerely,

Beth Crea

Beth Crea
Office of the Chief Legal Counsel
Massachusetts State Police
(508) 820-2311

20

State of Rhode Island and Providence Plantations

SENATOR
MICHAEL J. FLYNN
3 Hawthorne Road
Greenville, Rhode Island 02828

Room 120, State House
Providence, Rhode Island 02903

Bus.: 401-277-2708
Fax: 401-277-1206

Committee on Judiciary

Committee on Labor

Senate Chamber

July 25, 1998

Ms. Debbie Sellers
19 Blue Jay Way
Attleboro, MA 02703

Dear Debbie:

Recently, I saw my good friend, Arthur D'Amario, and he mentioned the restraining order you had placed against him in Attleboro District Court.

Actually, I have known Arthur and his family for many years. During that time, I have always found them to be hard working, conscientious citizens of our town. Furthermore, Arthur is no criminal. On the other hand, as you know, he has had some brushes with law enforcement officials over the years. Why is this? In my opinion, several of these encounters were intended to harass him for exposing the ineptness of these same officials in a court of law.

With this brief explanation, I hope you will reconsider dismissing your complaint against him.

Sincerely yours,

Michael J. Flynn

Michael J. Flynn
SENATOR, DISTRICT 29

MJF:plm

21

# Forensic Science Applications

Examination of Questioned Documents

August 31, 1999

Mr. Arthur D'Amario
02989-070 Duke Unit
Federal Correctional Institution
P.O. Box 1000
Butner, North Carolina 27509-1000

Dear Mr. D'Amario:

I have received your letter, dated August 22, 1999. I am writing this letter to you without answering any of the questions you have asked.

I am doing this for two (2) reasons. First, I was retained by the Attleboro Massachusetts Police Department to work on their behalf concerning evidence relating to you as detailed in my report, dated February 26, 1999. Because of this relationship, I feel obliged to discuss matters relating to this evidence and the circumstances surrounding it, only with proper authorities from that department. Of course, if you obtain written permission or if I am ordered by a court, I will gladly discuss these matters with your attorney. My hourly fee in such instances is $100.00 per hour. Second, it is my practice to deal with clients through their attorneys. Occasionally, I will discuss issues with non-represented individuals but never in a case in which the person is incarcerated.

Therefore, if you still desire to make inquiries of me, please do so through your attorney with the appropriate permission from the Attleboro Police Department or by means of a subpoena issued by an authority.

I am providing a copy of this letter to Mr. Edward C. Roy, Jr., the attorney who last

SEP - 7 1999

RR 3, Box 110-N Vineyard Haven, Massachusetts 02568 Tel 508-693-5635 • Fax 508-693-5636

contacted me on your behalf and to the Attleboro Police Department, so they both will be aware of my position in dealing with your inquiries.

Sincerely,

Alan T. Robillard

cc: Sgt. Kenneth Collins
Edward Roy, Jr.

[redacted]
Forensic Examiner of Qu[redacted]ued Documents
Handwriting Specialist
Retired FBI Supervisory Special Agent

[redacted]

[redacted] Telephone
[redacted] Cell
[redacted] Facsimile
[redacted]x.net

March 07, 2007

Arthur D'Amario, III
02989-070
Federal Detention Center
Post Office Box 562
Philadelphia, PA 19105

RE: YOUR REQUEST FOR ASSISTANCE

Dear Mr. D'Amario:

Your submitted material is enclosed. I have not retained copies. Please see written remarks that I made in your three-page letter.

Without an examination of the original two questioned greeting cards, I can make no determinations. If the questioned greeting cards become available, please submit them to me for examination.

You may also consider submitting your personal Smith-Corona typewriter for examination.

Sincerely,

[redacted]

23

IN SIGHTS
INVESTIGATIVE GROUP INC.

P.O. Box 22051
Cranston, RI 02920

October 16, 2000

Arthur D'Amario III
# 02989-070
PMB 400 Federal Medical Center
Rochester, MN 55903-4000

Dear Mr. D'Amario:

As you will recall, we discussed in detail what approach would be taken to obtain the information you were requesting.

Initially, my efforts were thwarted. Time and money was wasted when Mr. Roy scheduled and appointment with me and then cancelled it at the last minute. He refused to let me review **ANY** of his records. I don't understand how he could judge my competency from a simple conversation asking to meet with him, but I can not be held accountable for his actions, or his statements.

I looked thoroughly into Natalia Mendes' background as you requested although you initially had me looking into Natalia Mende<u>z</u>. We learned a great deal about Ms. Medes and her family however nothing relevant to your case.

We also looked into Ms. Seller's and her parents' ( Robert R. Punch, born 1938 & Carol A. Punch 1940 ) background looking for ties to the police department.

We conducted a background check on Ms. Sellers and Ms. Mendes however there was nothing on file.

Two trips were made to the Attleboro District Court to retrieve the "tape" you requested, which still remains in their custody. We obtained a "Cassette Copy Order Form", however, you stated that you would obtain it on your own.

We met with you on three separate occasions at the in-take center and received a minimum of three collect calls from you.

I contacted Mr. Hochman at your request to arrange an interview with Ms. Sellers. You specifically stated that I was not to talk to Ms. Sellers without Mr. Hochman's permission since you were concerned that this may be construed as harassment. After several attempts, we spoke with Mr. Hochman. He stated that he would not allow Ms. Sellers to speak with us!

A criminal defense investigation typically costs several thousand dollars and initially requires all available prosecution and defense files before it can begin! You did

(401) 944-6445

Fax: (401) 944-6502

not want me to use up funds obtaining these vital documents since they were already at your disposal.

One Thousand dollars provides approximately 20 hours of investigative time, which is used up in minimum 3-hour blocks; that doesn't include expenses.

I hope this answers your question on where the $ 1,000.00 was allocated.

Your account still has a small balance and I will be willing to look into this matter further. If you would like, I'll contact Ms. Sellers and see what she will tell me. Compile a list a specific questions that you feel are most relevant to your and I'll ask them. Rest assured, I will look into Mr. Roy's affidavit and he will be held accountable for any slanderous marks that he has made.

Sincerely,

Mark Champagne

24

ROY & COOK
ATTORNEYS AT LAW

86 WEYBOSSET STREET
PROVIDENCE, RHODE ISLAND 02903

EDWARD C. ROY, Jr.
GERALYN M. COOK*

* *admitted in RI and NY*

(401) 273-4900
FAX (401) 331-0436

March 3, 2000

Arthur D'Amario
c/o INTAKE SERVICE CENTER
PO Box 8249
Cranston, RI 02920

RE: UNITED STATES OF AMERICA
V. ARTHUR D'AMARIO

Dear Arthur:

I received your letter of February 28, 2000 and I am not hiding anonymous cards from you. If you paid a detective $1,000.00 to link the unknown Mendez woman to some typeset I think it's a waste of your money.

Thank you for your cooperation.

Very truly yours,

EDWARD C. ROY, ESQUIRE

ECR:slc

Enc.

25

RHODE ISLAND DEPARTMENT
OF CORRECTIONS
PSYCHIATRIST CONTACT NOTES

NAME D'AMARIO, ARTHUR

DOB 6/9/52

S (subjective symptoms) O (objective findings)
A (assessment or impression) P (plan)
All entries must be signed, dated and timed.

| DATE & TIME | SECURITY | ENTRY CODE |
|---|---|---|
| March 9, 1999 9:45am | ISC | Inmate seen at the request of Superior Judge Pfeiffer. Inmate presents in a clean and coherent manner. He is oriented to person place and time. He is friendly and cooperative displaying no evidence of a thought, feeling or behavioral disorder. He describes no history of drug or ETOH abuse. He does report a hx of being treated for depression most recently by Dr Frank Feiner. He is prescribed no medication for this at this time. There is no evidence of danger to self or others at this time. No acute problems noted. No indication for mental health services at this time. He is planning on following up with Dr Feiner when released. Alan B Feinstein [illegible] Clinical Psychologist |

26

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

UNITED STATES

v. NO. CR 99-30-01-JD

ARTHUR D'AMARIO

ENTRY OF APPEARANCE

FOR THE THIRD TIME, DEFENDANT ARTHUR D'AMARIO ENTERS HIS APPEARANCE PRO SE, PURSUANT TO FARETTA V. CALIFORNIA.

DEFENDANT, PRO SE,

[signature]

ARTHUR D'AMARIO III 02984-070
F.C.I.
P.O. BOX 1000
BUTNER, N.C. 27509-1000

CERTIFICATION

I HEREBY CERTIFY THAT ON JULY 19, 1999, I MAILED A COPY TO AUSA STEPHANIE BROWNE,

[signature]

ARTHUR D'AMARIO III

27

To: Ed Roy Re: Arthur D'Amario, III

Please contact Dr. Feiner! re: march!

**You can contact Dr. Feiner at 885-3063** (this is Arthur's treating psychologist/psychiatrist for a long time. Arthur has given you permission to discuss the case with Dr. Feiner).

**You may also contact Andy Horwitz regarding this case - 276-4880** Please contact Andy

Regarding the gun:

**What if** they told the store owner to destroy the original receipt for the gun from 1988 (11 years ago)?

(You could get serial number, too.)

28

Roger Williams University School of Law

150 WASHINGTON STREET
PROVIDENCE, RHODE ISLAND 02903
(401) 276-4880 FAX (401) 276-4899

CRIMINAL DEFENSE CLINIC
Professor Andrew Horwitz, Director

July 11, 2000

Mr. Arthur D'Amario, III
Register No. 02989070
Federal Correctional Institution
P.O. Box 7000
Fort Dix, NJ 08640

Dear Arthur:

I just received your letter dated July 7, 2000. Here are the addresses and numbers that you asked me to track down:

Richard Coughlin, Esq.
Federal Public Defender
800 Hudson Square, Suite 350
Camden, NJ 08102
(856) 757-5341

Lawyer Referral Service
Camden County Bar Ass'n
800 Hudson Square, Suite 103
Camden, NY 08102
(856) 964-4520

NJ Protection & Advocacy, Inc.
210 So. Broad Street, 3rd Floor
Trenton, NJ 08608
(609) 292-9742

With respect to my conversation on February 8, 1999, with Captain Catlow, my notes do not reflect what he said about <u>why</u> you weren't being arrested. I clearly remember discussing that fact with him, but my recollection of his explanation is far less clear. To the best of my recollection, I believe he told me that it was because the mere possession of an unregistered firearm was not a crime in Rhode Island.

Best of luck with your petition. Keep me posted.

Sincerely,

Andrew Horwitz

 29

STATE OF RHODE ISLAND
PROVIDENCE, SC.

SUPERIOR COURT

ARTHUR D'AMARIO III

V.

FRANK J. RUSSO; individually,
GEMINI CONCERTS;
CONCERTS EAST;
HARRISON FUNK (alias);
GAIL ROBERTS; individually,
GAIL ROBERTS PUBLIC RELATIONS,
RTC MANAGEMENT;
CAPITOL RECORDS, inc.;
WILLIAM BLACKWELL;
JEFF ROSS (alias);
THE DISTANCE, inc.;
EDWARD "PUNCH" ANDREWS; and
PUNCH ENTERPRISES

C.A. NO. 86-862
862

Count I: Libel
Count II: Breach of Contract
Count III: Tortious Interference with Business Relationship
Count IV: Civil Conspiracy

COMPLAINT

PARTIES

1. Defendants Frank Russo, Gemini Concerts and Concerts East live and do business in the state of Rhode Island.

2. Defendant Harrison Funk is a resident of New York and travelling photographer who does work in Rhode Island.

3. Defendants Gail Roberts and Gail Roberts P.R. are based in California but have the necessary minimum contacts with the state of R.I. to be subject to the Court's jurisdiction.

4. Defendant Jeff Ross is a travelling road manager of touring entertainers who has done work in the state of R.I. His present whereabouts are known only to the other defendants.

5. Defendant Capitol Records is a corporation based in California with sufficient minimum contacts with the state of R.I. to be subject to the jurisdiction of this Court.

6. Defendants Blackwell, Andrews, The Distance and Punch Enterprises are citizens and residents of the state of Michigan. They book and produce rock concerts in the state of R.I.

# 7695



SUPERIOR COURT
FILED
RICHARD J. CEDOR, CLERK

LIB
9991

FACTS

7. On June 9, 1983 Plaintiff Arthur D'Amario III entered into an agreement with Defendant William Blackwell which would allow the plaintiff to photograph singer Bob Seger at the Providence Civic Center on June 10, 1983. Blackwell was at that time representing defendants The Distance and Punch Enterprises, as well as Edward Andrews, his employer.

8. On or about June 9, 1983 Blackwell received information from defendant Capitol Records that the plaintiff was in the business of making money by "bootlegging photographs."

9. On June 9 and/or June 10, 1983 Blackwell was visited at the Biltmore Hotel in Providence by concert promoter Frank J. Russo, representing his corperations Gemini and Concerts East. Blackwell received information from Russo that the plaintiff was a bootlegger who used his photos in violation of the copyright laws and the privacy rights of the entertainers.

10. On June 10, 1983 Blackwell terminated his agreement with the plaintiff based on the false reports he had received. On this night Russo acknowleged to the plaintiff that he'd had a photo pass but that it was for "the previous night's show." Russo admitted he had just talked to Blackwell about me and that I "no longer had a photo pass." This conversation took place in the office of Civic Center Director Dorothy LeGrand, who was present the entire time.

11. Mrs. LeGrand phoned Blackwell to find out what Russo had said. She would not tell me Blackwell's answer but stated he would not talk to me. I called Blackwell myself and asked "What did Russo say to you?" He replied "no comment" and hung up.

12. The following week defendants Capitol Records and Edward Andrews were asked by the plaintiff to reinstate his photo pass for the Hartford show of June 17, 1983. Without giving a reason, all parties denied the request. In the ensuing weeks, Capitol's publicists in New York City refused to speak to the plaintiff by phone or in person at their Manhattan office.

13. On July 1, 1983 plaintiff met with defenants Jeff Ross and RTC Management at their office on east 63rd St. in Manhattan. Ross identified himself as "the man at the top" at RTC Mgt. Ross refused to look at plaintiff's published works, or "credentials" stating he knew there was a problem between "you and Frank." Ross would not grant plaintiff a photo pass for the Diana Ross concert of August 6, 1983 in Providence for that reason.

14. On July 25, 1983 plaintiff again visited RTC to request a photo pass. Again Ross said no and refused to look at my work. Plaintiff was told when Ross left that Gail Roberts Public Relations in Los Angeles actually dispenses photo passes for all performances by Diana Ross. This information came from RTC's receptionist.

15. On July 28, 1983 plaintiff phoned defendants Roberts and Gail Roberts Public Relations for a photo pass to the August 6 Diana Ross concert at the Providence Civic Center. Secretary "Marilyn" took the call and instructed plaintiff to put his request in writing, which was done that same day.

16. On August 5, 1983 defendant Harrison Funk, then office manager of Retna Ltd. in New York (plaintiff's photo agency) called to say Gail Roberts had approved the photo pass and it would be left at the will call window of the box office in the plaintiff's name. In case of a problem, Ms. Roberts left two names to contact: Jeff Ross, and Al Dotoli, who is promoter Russo's production manager.

17. On August 6, 1983 plaintiff received his envelope at the box office with his name on it. It contained only a useless complimentary ticket in a distant location, too far from the stage to take pictures. The vital photo pass was missing.

18. Plaintiff went to the stage door and met with Jeff Ross. He said he would get a photo pass, but he returned without it and said plaintiff would not need it. Ross escorted the plaintiff to his 2nd row seat and said he could shoot from there. When Ross left, Russo, standing close by, followed him backstage.

19. Ten to Twenty minutes later Ross came back and was extremely angry, pointing his index finger in plaintiff's face and asking how plaintiff found out who Gail Roberts is. Ross also demanded proof that plaintiff shoots for Retna Ltd. and demanded to see proof that numerous magazines have published the plaintiff's pictures. He was told that proof was made available to him in New York July 1st and 25th but he refused to look at it. After threatening plaintiff with ejection he left. Immediately Russo appeared and stood next to the plaintiff throughout the first half of the concert.

20. On August 8, 1983 Harrison Funk called the plaintiff and shouted "Are you bootlegging t-shirts?" Allegation was denied and Funk explained Gail Roberts had just spent 20 minutes "chewing my ear off" because someone informed her plaintiff used his photos to make bootleg t-shirts. Funk said Roberts was threatening to deny press credentials to all Retna photographers for representing a bootlegger.

21. On that same day Gail Roberts would not accept a phone call from the plaintiff. Journalist Bob Angell of the NewPaper phoned her in the plaintiff's presence and said "I've got a report that Frank J. Russo told you rock photographer Arthur D'Amario is a bootlegger." Angell told the plaintiff her responce was "It wasn't Russo who called. Other than that I have no comment."

22. Add to paragraph #19 that Jeff Ross allowed the plaintiff to remain in the arena only after surrendering to him the complimentary ticket and the envelope with plaintiff's name on it. This was the only physical evidence that the plaintiff had in fact been on the pass list.

23. Plaintiff returned to RTC Mgt. on August 10, 1983 to confront Jeff Ross. Plaintiff was told he was still travelling with the tour and would be back in September. In September the plaintiff was told Ross no longer works there.

24. On August 10, 1983 plaintiff met with Harrison Funk at Retna's office. Funk said he could not defend plaintiff's reputation against bootlegging allegations because it was too

risky to argue with people like Gail Roberts "who are the music business." At that time or later that month Funk stated he could no longer obtain press passes for the plaintiff and any calls inquiring if Arthur D'Amario works for Retna Ltd. would be replied to thusly: "No, we've never heard of him." Funk insisted this policy was necessary to protect the other photographers and was in effect only because of Frank J. Russo's smear campaign.

25. Plaintiff was swiftly weeded out of the rock concert photography business and eventually blacklisted. Income has been taken away along with numerous opportunities to photograph other new stars and advance in this field.

26. Defendant Capitol Records and its subdivisions, for example, still refuse to grant photo passes to the plaintiff, even when he is on assignment for a specific publication.

27. Attorney Melissa K. Weeks, representing Jeff Ross and Gail Roberts, has stated it is not possible to admit to the facts on the record for fear it would strengthen plaintiff's standing in a seperate civil suit vs. Frank Russo regarding the right to take pictures in the Providence Civic Center.

28. Plaintiff alleges two seperate conspiracies initiated by Russo in retaliation for the civil suit filed in May, 1983, docket #83-0336S (federal court).

29. Motivation for involvement of other defendants to cover up libelous actions of Russo was not just an original belief that rumours were true, but a desire to see plaintiff lose in his attempt to have district court invalidate contractual clauses restricting the use of cameras.

## COUNT 1

(Libel)

30. Paragraphs 1 through 29 of the complaint are hereby restated as if set forth fully at length herein.

31. By reason of the foregoing, defendants Russo, Gemini Concerts, Concerts East, Capitol Records, William Blackwell, Edward "Punch" Andrews, Gail Roberts and Jeff Ross have libeled the plaintiff, thereby causing severe harm to the plaintiff.

32. Actions of these defendants as aforesaid were willful, malicious and in reckless disregard of the truth. At no time were defendants able to produce evidence of their allegations when called upon to do so.

WHEREFORE, plaintiff Arthur D'Amario III demands judgment against said defendants, jointly and severally, in the amount of Fifty Thousand Dollars ($50,000) as compensatory damages and the additional sum of Five Hundred Thousand Dollars ($500, 000) as punitive damages, plus interest and costs.

COUNT II

(Breach of Contract)

33. Paragraphs 1 through 29 of the complaint are hereby restated as if set forth fully at length herein.

34. By reason of the foregoing, defendants Harrison Funk, Gail Roberts, Gail Roberts Public Relations, Jeff Ross, RTC Management, William Blackwell, The Distance, Punch Enterprises, and Capitol Records have breached their contractual agreements with the plaintiff, thereby causing damages to the plaintiff.

35. Actions of these defendants as aforesaid were willful, malicious and in reckless disregard of the plaintiff's contractual rights.

WHEREFORE, plaintiff Arthur D'Amario III demands judgment against said defendants, jointly and severally, in the amount of Fifty Thousand Dollars ($50,000) as compensatory damages and the additional sum of Five Hundred Thousand Dollars ($500, 000) as punitive damages, plus interest and costs.

COUNT III

(Tortious Interference with Business Relationship)

36. Paragraphs 1 through 29 of the Complaint are hereby restated as if set forth fully at length herein.

37. The above described acts of defendants Frank J. Russo, Gemini Concerts and Concerts East were a tortious interference with an advantageous business relationship of the plaintiff.

38. Defendants Russo, Gemini, and Concerts East at all times mentioned herein knew of said advantageous relations.

39. The actions of these defendants as aforesaid were willful, malicious and in reckless disregard of the plaintiff's contractual rights.

WHEREFORE, Plaintiff Arthur D'Amario III demands judgment against Defendants Frank J. Russo, Gemini Concerts and Concerts East, jointly and severally, in the amount of Fifty Thousand Dollars ($50,000), as compensatory damages and the additional sum of Five Hundred Thousand Dollars ($500,000) as punitive damages, plus interest and costs.

COUNT IV

(Civil Conspiracy)

40. Paragraphs 1 through 29 of the Complaint are hereby restated as if set forth fully at length herein.

41. Upon information and belief, all named Defendants reached a joint agreement to unlawfully deprive the plaintiff of his business and reputation. Defendant Frank Russo started this out of revenge for the civil rights suit, and the others joined in to tip the scales in his favor. Defendant Jeff Ross has, upon orders or suggestion from Russo, confiscated and destroyed important physical evidence.

42. The actions of all defendants as aforesaid were willful, malicious and in reckless disregard of the plaintiff's contractual rights and reputation as a legitimate photojournalist.

WHEREFORE, Plaintiff Arthur D'Amario III demands judgment against Defendants Frank J. Russo, Gemini Concerts, Concerts East, Harrison Funk, Gail Roberts, Gail Roberts Public Relations, RTC Management, Capitol Records, Jeff Ross, William Blackwell, The Distance, Edward "Punch" Andrews and Punch Enterprises, jointly and severally, in the amount of One Hundred Thousand Dollars ($100,000) as compensatory damages and the additional sum of One Million Dollars ($1,000,000) as punitive damages, plus costs and interest.

Arthur D'Amario III
Pro Se
Indian Run Trail
Smithfield, R.I. 02917
(401) 949-3361

STATE OF RHODE ISLAND
SUPREME COURT
JUDICIAL RECORDS CENTER

I hereby certify that this document is an exact photographic reproduction of the original document on file in the R.I. Supreme Court Records Center

Plaintiff hereby demands trial by jury.

Arthur D'Amario III

ARTHUR D'AMARIO III

 **30**

STATE OF RHODE ISLAND
AND
PROVIDENCE PLANTATIONS

CIVIL CASE
CLERKS INFORMATION
REPORTING FORM

SUPERIOR COURT

S-220

| CASE TITLE | | CASE NUMBER |
|---|---|---|
| Anthony D'Amario III vs Frank J. Russo, et al | | C.A. 86-2162 |
| DATE | JUDGE | CLERK |
| 5-13-91 | Needham | Lucille Kildune |

☒ Motion Calendar ☐ Formal & Special Cause Calendar ☐ Misc. Calendar Trial Calendar ☐ Jury ☐ Non-Jury

Plaintiff's Motion to Amend the Judgment entered July 2, 1990 was heard and is Granted as to all defendants.

Judgment to enter without prejudice, as against all defendants.

31



Court will only decide the motions now pending.

*Background*

This dispute arose directly out of an earlier action brought before this Court by the plaintiff, D'Amario, against the Providence Civic Center Authority [hereinafter "PROCCA"], and one of the named defendants, Frank J. Russo.

D'Amario was a freelance commercial photojournalist who photographed "rock" concert performers. D'Amario would consign his pictures to a commercial agency which in turn would sell the photos to entertainment-oriented publications. PROCCA frequently consented to and enforced a non-negotiable condition with performers that no photographs be taken of the performance. On several occasions, while this condition was in effect, D'Amario requested admittance to the Civic Center for the purpose of photographing entertainers, but was either denied access to the building or prevented from taking pictures.

Consequently, in May of 1983 D'Amario filed a complaint based upon 42 U.S.C. § 1983 against PROCCA and concert promoter, Frank J. Russo, alleging that such a deprivation was violative of his First Amendment rights of freedom of speech and freedom of the press. D'Amario sought declaratory and injunctive relief in addition to monetary compensation. On July 30, 1986, Judge Selya, then sitting as a District Judge, dismissed D'Amario's claim on the merits, ruling that PROCCA's "no camera" rule "does not impinge impermissibly upon freedom of speech or freedom of the press." *D'Amario v. Providence Civic Center*, 639 F.Supp. 1538, 1544 (D.R.I. 1986), *aff'd*, 815 F.2d 692 (1st Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 172, 98 L.Ed.2d 125 (1987).

The events leading up to Judge Selya's July 1986 decision are the subject of this action and were the basis for an identical claim brought by D'Amario before the Superior Court of Rhode Island in June of 1986. D'Amario's claim before the Superior Court was dismissed, however, in March of 1987 for his willful disobedience of court orders—i.e. failing to comply with court ordered discovery.

*Complaint*

The instant action is simply a refiling of the complaint brought before the Superior Court. D'Amario's complaint in four counts is against defendants, Frank J. Russo (hereinafter "Russo"); William Blackwell; The Distance, Inc.; Punch Enterprises; Capitol Records, Inc.; Harrison Funk; Gail Roberts (hereinafter "Roberts"); RTC Management (hereinafter "RTC"); and Jeff Ross. Counts I, II, and III are state civil actions brought on the heels of Count IV, a federal civil rights action. Count I alleges that the defendants libeled D'Amario. Count II alleges that the defendants breached contractual obligations with D'Amario, and Count III alleges that defendants' conduct resulted in the tortious interference with D'Amario's business relationships.

Count IV, the main thrust of D'Amario's action, purports to state a claim under 42 U.S.C. §§ 1985 and 1986, and alleges that, *inter alia*, the named defendants conspired to influence Judge Selya's decision through the alteration of evidence and the giving of false testimony. D'Amario asserts that his constitutional rights as provided by the First, Fifth and Fourteenth Amendments were violated. Yet, plaintiff fails to specify how defendants transgressed his rights. This Court can only assume that plaintiff's claims are based upon the following assertions: (1) that plaintiff was deprived of his rights of freedom of speech and freedom of the press as provided by the First Amendment of the United States Constitution; (2) that plaintiff was deprived of the right to due process in conjunction with the right to a fair trial as provided under the Fifth Amendment of the Constitution; and (3) that plaintiff was deprived of the right to equal protection of the laws under the Fourteenth Amendment of the Constitution.

Defendant Russo asserts that D'Amario's complaint should be dismissed for the following reasons: (1) based upon Fed.R. Civ.P. 12(b)(6), plaintiff has failed to assert

 32

June 28, 2000

Received a telephone message from Supervisor [redacted] re: a possible threat against Judge [redacted] received a telephone call from the marshals' office in Rhode Island. [redacted] was at USMS headquarters and was passing on the message for action here. b7C

Deputy US Marshal [redacted] was contacted and message left [redacted] returned the call and left the message that DUSM [redacted] was handling the threat [redacted] was called and a message was left. [redacted] called back about 3:30 P.M. and relied the following information. The US Attorneys office for the District of Rhode Island had received a letter from Attorney [redacted] stated that in her cover letter that D'AMARIO had threaten Judge [redacted], as well as US District Judge [redacted] further stated that D'AMARIO was in FCI Fort Dix, Fort Dix, NJ. And D'AMARIO's release date was set for July 4, 2001. Any change in that status security for Fort Dix would notify [redacted] A copy of the threat letter and cover letter was faxed to this office. A discussion was had with Assistant US Attorney [redacted] stated that the letter has been turned over to SA [redacted] also stated that she has spoken with an assistant that is handling a motion for release from D'AMARIO to the 3th circuit. Based on the overt violence stated in the letter, which according to [redacted] is a change for D'AMARIO, the warden for Fort Dix moved D'AMARIO in protective custody. Also the warden would notify the Marshals Service if any change in D'AMARIO's status. b7C

Judge [redacted] chambers were contacted and informed of the threat. The judge is out of the country till Monday, July 3th. A message was left to have the judge get in touch with this office as soon as possible. b7C

Court Security Inspector [redacted] was notified by telephone. A 550 would be done as soon as a copy of the Rhode Island was received. Chief [redacted] was notified. b7C

June 29/30

Spoke to [redacted] from RI decided that only one 550 would be submitted by [redacted] with secondary notice to this office. D'AMARIO was placed on suicide watch by BOP based on threats against himself in the letter. See attached email from [redacted]

Supervisor SA [redacted] called back and stated that SA [redacted] would be assigned to the case. b7C

-6

33

July 3th

Chief relied that he spoke to Judge [redacted] about D'AMARIO and his status. Received letters from [redacted] with 550, picture and cover threat notice. Received voice mail from U. S. Attorney Craig Moore that he has assigned case to AUSA Terrance Donnelly. [redacted]

b7C

Received call from [redacted] that BOP moved D'AMARIO without notifying USMS, D'AMARIO now in FMC Rochester. **FMC Rochester 2110 East Center Street Rochester, MN 55904 (507) 287-0674, fax (507) 287-9600.** [redacted] stated that he refiled a notice with BOP on D'AMARIO for movement. BOP move D'AMARIO for safety reasons and for a study of his mental health. BOP told [redacted] that D'AMARIO has been slipping over the recent time.

b7C

July 17th

Received copy of mental health request from FCI Ft. Dix to FMC Rochester from [redacted] Ft. Dix feels like D'AMARIO has been going downhill and needs more help then Ft. Dix can provide.

b7C

July 27th

Received voice mail from Terrance Donnelly 401-528-5216. Donnelly stated that his office has a conflict of interest in this case as one of the other AUSAs in that office was threatened. The case has been referred D/NJ for pros. Donnelly will keep track of it and keep us informed as to the status.

August 2, 2000 / 09:51

While on assignment received voice mail from [redacted] that BOP has decided that D'AMARIO's state jail time counts and that he D'AMARIO is to be released. BOP is going to fly D'AMARIO to Providence, RI on a commercial flight and release him today. I received this voice mail at 10:05 or so and called the office left voice fo[redacted]nd the spoke to the Chief to be sure someone got the message right away. Chief stated that he would speak to [redacted] and go from there.

b7C

Spoke to the Chief late in the afternoon he had spoke to [redacted] and, Donnelly. Donnelly took hold of the matter and ensured that D'AMARIO was not released and that the state time did not count toward his sentence computation.

b7C

August 11, 2000

Called Donnelly to get an update on the case, left a message. Called [redacted] or update nothing new D'AMARIO still in Rochester.

b7C

155

 34

August 14, 2000

Received call from AUSA Terrance Donnelly re: D'AMARIO. D'AMARIO is still in Rochester, the mix-up came from a clerk there for the release, that has been handled, Still waiting for NJ to pros. The case and he (Donnelly) would stay on top of that.

October 2000

Called AUSA Terrance Donnelly re: D'AMARIO for an update of case. Donnelly called D/NJ for a case update and was told that the assistant was tied up in trial but would likely indict D'AMARIO after the trial ends about October 27, 2000.

November 21, 2000

Received a cellphone call from Supervisor [redacted] that Judge [redacted] had received another letter from D'AMARIO and please update the case. b7C

November 22, 2000

Reviewed two pieces of inappropriate communication from D'AMARIO from the judges' chambers. One dated November 7th and the other dated November 15th. Spoke to AUSA Terrance Donnelly updated him with the two pieces of communication. Donnelly gave D/NJ AUSA Debra Goldklang [redacted] Called Goldklang and left a message to called either [redacted] or myself re: the new letters, also for an update of the status of the indictment. Called Threat desk spoke to [redacted] with new communications, requested an 11 and copies fax to him. Done. b7C

Debra Goldklang called back wanted the letters faxed to her. Case is still pending, per her. Forwarded her call to SDUSM and CDUSM. Fax # 973-645-3497

January 30, 2001

Per the Chief called D/NJ AUSA Debra Goldklang [redacted] re: status of case. Chief is meeting with Judge [redacted] and needed an update. Debra not in spoke to secretary [redacted] stated that subject not indicted, yet. b7C

35



UNITED STATES DISTRICT COURT,
DISTRICT OF NEW JERSEY,
CAMDEN, NEW JERSEY, 08101

THE UNITED STATES OF AMERICA,

VS.

CRIMINAL DOCKET NUMBER 01-346 (JEI)

ARTHUR D'AMARIO,

DEFENDANT.

TRIAL

NOVEMBER 29, 2001
MITCHELL COHEN COURTHOUSE
JOHN F. GERRY PLAZA,
CAMDEN, NEW JERSEY, 08101

B E F O R E: THE HONORABLE JOSEPH E. IRENAS,
U.S. DISTRICT COURT JUDGE,
DISTRICT OF NEW JERSEY

A P P E A R A N C E S:

DEBORAH L. GOLDKLANG, ASSISTANT U.S. ATTORNEY, FOR THE UNITED STATES OF AMERICA.

LORI M. KOCH, ASSISTANT FEDERAL PUBLIC DEFENDER AND CHRISTOPHER O'MALLEY, ASSISTANT FEDERAL PUBLIC DEFENDER, ATTORNEYS FOR DEFENDANT, ARTHUR D'AMARIO

STEPHEN J. DANER,
REGISTERED PROFESSIONAL REPORTER,
CERTIFIED SHORTHAND REPORTER,
OFFICIAL U. S. REPORTER

WITNESS INDEX

ANDREW L. OLNES

DIRECT 15

CROSS-EXAMIATION 20

REDIRECT 28

RECROSS-EXAMINATION 30

EDWARD ROY

DIRECT 32

CROSS-EXAMINATION 78

REDIRECT 115

STEVEN BARTLETT

DIRECT 121

CROSS-EXAMINATION 135

REDIRECT 156

RECROSS-EXAMINATION 162

ANDREW OLNES

DIRECT 166

CROSS-EXAMINATION 170 & 176

SENT THAT DOWN TO OUR THREAT DESK IN D.C., AT THE HEADQUARTERS. I READ THE LETTER AND THEN I WENT UP TO JUDGE DICLERICO'S CHAMBERS TO NOTIFY THE JUDGE.

Q. BY CHAMBER, IS IT THE SAME AS THE JUDGE'S OFFICE?

A. THE JUDGE'S OFFICE, YES.

Q. WHAT IF ANYTHING DID YOU DO WHEN YOU WENT TO JUDGE DICLERICO'S CHAMBERS?

A. JUDGE DICLERICO WAS OUT OF THE COUNTRY ON VACATION AT THE TIME. I NOTIFIED HIS SECRETARY, AND LEFT HER A COPY OF THE LETTER ASKING HER TO HAVE THE JUDGE GET IN CONTACT WITH THE MARSHALS SERVICE AS SOON AS HE RETURNED FROM HIS VACATION.

Q. DID YOU HAND-DELIVER A COPY OF THE LETTER TO CHAMBERS?

A. YES, I DID.

Q. MR. BARTLETT, DID YOU EVER MEET FACE-TO-FACE WITH JUDGE DICLERICO TO DISCUSS THE LETTER?

A. YES, I DID. JULY 3RD, WHICH WOULD BE THE MONDAY, I THINK HE RETURNED ON SUNDAY, AND I TALKED TO HIM MONDAY WHEN HE GOT INTO THE OFFICE.

Q. WHAT DID YOU TELL THE JUDGE AT THAT TIME?

A. I WENT OVER THE LETTER WITH THE JUDGE AND BASICALLY ASKED THE JUDGE IF HE REQUESTED PROTECTION AT THE TIME, WHICH OF COURSE HE DID NOT NEED TO. BUT THAT WOULD BE ONE OF THE STEPS I TOOK.

Q. WHY DIDN'T THE JUDGE NEED PROTECTION AT THAT SPECIFIC

TIME?
A. I KNEW WHERE MR. D'AMARIO WAS AND HE WAS UNAVAILABLE TO GET TO THE JUDGE AT THAT POINT. HE WAS IN JAIL.
Q. DID THE JUDGE INSTRUCT YOU TO DO ANYTHING AT THAT TIME?
A. KEEP HIM ADVISED OF THE CASE. LET HIM KNOW WHERE IT WAS GOING, AND THE STATUS OF IT, AND THAT WAS ABOUT IT.
Q. DID YOU OBSERVE THE JUDGE'S DEMEANOR DURING THAT MEETING?
A. YES, I DID.
Q. WHAT WAS THAT?
A. HIS DEMEANOR WAS, THE JUDGE WAS CONCERNED, BUT AGAIN WE KNEW WHERE MR. D'AMARIO WAS AND AS LONG AS HE WAS IN CUSTODY OR INCARCERATED, WE KNEW THAT, WE KNEW OF WHAT HE HAD WRITTEN IN THE LETTER, BUT ALSO KNEW RIGHT THEN AND THERE HE WASN'T A THREAT TO THE JUDGE.
Q. FOLLOWING YOUR MEETING WITH JUDGE DICLERICO, DID YOU KEEP TABS ON THE DEFENDANT'S RELEASE DATE FROM PRISON?
A. YES, I DID.
Q. WHY DID YOU DO THAT?
A. ONE, BECAUSE OF THE LETTER THAT HE HAD WRITTEN AND THE CONCERN THE JUDGE HAD FOR HIS SAFETY, AND BECAUSE OF THE OPEN CASE THAT I HAD AGAINST MR. D'AMARIO.
Q. AFTER YOU RECEIVED THAT LETTER, G-1, DID YOU OBTAIN A PHOTOGRAPH OF THE DEFENDANT?
A. I GOT A COPY OF HIS BOOKING PHOTO FROM RHODE ISLAND AND

THEN UPON MR. D'AMARIO'S RELEASE FROM CUSTODY IN MINNESOTA, I HAD THE PRE-TRIAL SERVICES OFFICER IN ARIZONA WHERE MR. D'MARIO WAS STAYING, GO OUT AND GET ANOTHER PHOTO. I HAD TWO PHOTOS OF HIM.

Q. WHY DID YOU OBTAIN THOSE PHOTOGRAPHS?

A. THE FIRST ONE, TO NOTIFY THE COURT SECURITY OFFICERS IN MY BUILDING JUST AS A PRECAUTION. AND THE SECOND ONE IS, ONCE HE WAS RELEASED I WANTED TO MAKE SURE THAT THE FIRST PHOTO WAS VERY SIMILAR OR WANTED TO SEE IF HIS LOOKS CHANGED, AND THEN WITH THE SECOND PHOTO ALSO NEEDED TO UPDATE THE COURT'S SECURITY OFFICES IN MY BUILDING AND THE LOCAL POLICE CHIEF OF THE TOWN WHICH THE JUDGE LIVES IN.

Q. NOW, FOLLOWING YOUR RECEIPT OF THAT LETTER, DID YOU IN FACT TRACK THE DEFENDANT'S WHEREABOUTS?

A. YES, I DID.

Q. DID YOU TRACK THE WHEREABOUTS OF EVERY DEFENDANT THAT'S CONVICTED IN COURT IN RHODE ISLAND -- I'M SORRY, NEW HAMPHSIRE?

A. NO, NOT AT ALL. NOT AT A THREAT COORDINATOR, NO.

Q. WAS THE DEFENDANT TO YOUR KNOWLEDGE ULTIMATELY RELEASED FROM CUSTODY?

A. YES, HE WAS.

Q. WHAT IF ANYTHING DID YOU DO AT THE TIME THE DEFENDANT WAS RELEASED FROM CUSTODY?

A. ONCE HE WAS RELEASED FROM CUSTODY I CHECKED TO SEE WHAT

CONDITIONS HIS RELEASE HAD, WHAT HIS CONDITIONS FROM RELEASE WERE, AND HE WAS ON ELECTRONIC MONITORING, THAT HIS BAIL HAD BEEN CO-SIGNED BY HIS PARENTS. I THEN CONTACTED THE PRE-TRIAL SERVICES OFFICER THAT WAS HIS REPORTING OFFICER. AND THEN I NOTIFIED, AGAIN, THE COURT SECURITY OFFICERS IN MY BUILDING AND THE LOCAL CHIEF OF POLICE FOR THE TOWN WHICH THE JUDGE LIVED IN.

Q. WHAT DID YOU TELL THE LOCAL CHIEF OF POLICE IN THE TOWN WHERE THE JUDGE LIVED?

A. BASICALLY, BASICALLY I BRIEFED THE CHIEF AS TO THE SITUATION OF THE CASE THAT WE HAD, MY CONCERNS THAT I HAD. AND SO THAT THE CHIEF COULD HAVE AN OFFICER READY IF WE NEEDED ONE TO RESPOND TO JUDGE DICLERICO'S HOME.

Q. DID YOU PROVIDE THE CHIEF OF POLICE A DESCRIPTION OF THE DEFENDANT?

A. I GAVE HIM A COPY OF A PHOTO WE RECEIVED FROM ARIZONA, FROM THE PRE-TRIAL SERVICES OFFICER.

MS. GOLDKLANG: I HAVE NOTHING FURTHER.

THE COURT: CROSS-EXAMINE. MISS KOCH, IS THAT YOU?

MS. KOCH: YES. THANK YOU.

(CROSS-EXAMINATION OF STEVEN BARTLETT BY MS. KOCH).

Q. COULD I ASK A BRIEF INQUIRY OF MISS GOLDKLANG?

THE COURT: SURE.

(OFF RECORD DISCUSSION BETWEEN MISS KOCH AND MISS

36

U.S. DISTRICT COURT
DISTRICT OF R.I.
FILED
MAY 23 10 42 AM '01

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF RHODE ISLAND

Arthur D'Amario

v.

C.A. No. 01-97

USA

## JUDGMENT

[ ] Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ x ] Decision by the Court. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED:

Judgment is entered in favor of the defendant pursuant to an Order dated 5/17/01.

*Barbara J. D'Amico*
Deputy Clerk
May 23, 2001

36A

issues should be considered on collateral attack.

The petition is dismissed.

SO ORDERED.

Joseph A. DiClerico, Jr.
Joseph A. DiClerico, Jr.
District Judge

May 17, 2001

cc: Arthur D'Amario, pro se
Stephanie S. Browne, Esquire
Clerk, USDC-RI

 37

| Incarcerated: X Yes __Unknown __No | Location: FMC Rochester, MN |
|---|---|

Additional Suspects: None

| FBI Notified: yes | Date: 06/27/00 | Initiated Investigation: x Yes or __No |
|---|---|---|
| Notified by: AUSA Craig Moore D/RI | | Joint Investigation: x Yes or __No<br>Requested Copy of Investigation? x Yes or __No |
| FBI Agent: [redacted] b7C | | Telephone #: |

Office: Providence, RI.

Brief Narrative: On May 18, 2001, D'AMARIO ( WIN # 371122 ) was indicted in the District of New Jersey for 18 U.S.C. 115 (a) (1) (B) & 2, threatening to assault and murder a United States judge. D'AMARIO was arrested by USMS and FBI at FMC Rochester and transported to D/MN for arraignment. D'AMARIO was held without bail, and order removed to the D/NJ. This charge stemmed from several letters written by D'AMARIO in June 23, 2000. On May 25, 2001, [redacted] received a letter at his chambers from D'AMARIO, dated May 21, 2001. The letter has been forwarded to the prosecuting attorney Deborah Goldklang [redacted] his letter does not openly threate [redacted] but does stated D'AMARIO will see the judge this summer in New Jersey for the trial of the other letters.

b7C

38

** TX STATUS REPORT ** AS OF DEC 03 2001 09:26 PAGE.01

US MARSHALS CONCORD

| | DATE | TIME | TO/FROM | MODE | MIN/SEC | PGS | JOB# | STATUS |
|---|---|---|---|---|---|---|---|---|
| 15 | 12/03 | 09:23 | 8569684917 | EC--S | 03'18" | 009 | 250 | OK |

b7C

Fed. Detention Center
P.O. Box 562
Philadelphia, PA 19106
Name: A. D'Amario
Reg. No. #

SCREENED USMS

USMS SCREENED PRISONER MAIL

[redacted]
Judicial Council of the First Circuit
1 Courthouse Way, Suite 3700
Boston, MA 02210

b7C

02210+3003 73

Fe... Detention Center
P.O. ... 562
Philadelphia, PA 19106
Name: A. D'Amario
Reg. No. #

b7C

USMS SCREENED
PRISONER MAIL

SCREENED
USMS

[redacted]

Judicial Council of the First Circuit
1 Courthouse Way, Suite 3700
Boston, MA 02210

b7C

b7C

02210+3005 79

186

40

b7C

# F A X

b7C

TO : [redacted] (Marshall's Office)

FROM : [redacted] chambers)

DATE : November 30, 2001

RE : Letter from A. D'Amario

PAGES : 8 (including cover)

1824

41

U.S. MARSHALS SERVICE

# U.S. MARSHAL

## OFFICIAL BUSINESS

## UNITED STATES MARSHALS SERVICE

**District of New Hampshire**
55 Pleasant Street, Suite 207
Concord, New Hampshire 03301

Main Office: (603)225-1632
Administrative FAX: (603)225-1633
Criminal/Warrants FAX: (603)225-1659

Raymond Gagnon, USM [redacted] CDUSM

b7C

WIN DISTRICT CODE: 049 NCIC/NLETS ORI: NHUSM01S0

b7C

TO: [redacted]
FROM: [redacted]
SENDER CONTACT NUMBER: [redacted]
DATE: 12/3/01
PAGES TO FOLLOW: 8 (EXCLUDING COVER SHEET)

COMMENTS: Please take this fax to either SA [redacted] or AUSA D. GOLDKLANG. THEY ARE ON TRIAL ON 5th FLOOR 5A COURTROOM

b7C

INFORMATION IS NOT TO BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED

185

42

U.S. MARSHALS SERVICE

# U.S. MARSHAL

OFFICIAL BUSINESS

## UNITED STATES MARSHALS SERVICE


District of New Hampshire
55 Pleasant Street, Suite 207
Concord, New Hampshire 03301

Main Office: (603)225-1632
Administrative FAX: (603)225-1633
Criminal/Warrants FAX: (603)225-1659 b7C

Raymond Gagnon, USM [redacted] CDUSM


WIN DISTRICT CODE: 049 NCIC/NLETS ORI: NHUSM01S0

b7C

TO: [redacted]
FROM: [redacted]
SENDER CONTACT NUMBER: [redacted]
DATE: 12/4/01
PAGES TO FOLLOW: 9 (EXCLUDING COVER SHEET)

COMMENTS: The two letters written by DAMARIO to 1st CIRCUIT COURT OF APPEALS

INFORMATION IS NOT TO BE DISSEMINATED OUTSIDE THE AGENCY TO WHICH LOANED

188

August 20, 2001,

Received a call from Chief [redacted] can't make the meeting today. Re-schedule for Wednesday, called and left message. Spoke to [redacted] this morning no photo yet, from AZ. Also received a package from [redacted]e: information from AZ. [redacted]ad also sent a copy of same info to Judge [redacted] Placed report in file.

August 22, 2001

Received the photos from [redacted] E-mailed the photos to [redacted]

August 23, 2001

Called the [redacted] Set-up an appointment to see him next week.

Unable to met with Chief, briefed by phone.

November and December 2001

Spoke with [redacted] in AZ for movement to NJ for the trial. Also spoke with Debra [redacted] about D'AMARIO's movement to NJ and off monitoring. Spoke to USPO Deputy Chief [redacted] in NJ about our concerns. Called [redacted]

Received info from Chief re: letter received by 1st Circuit Appeals Judge [redacted] chambers from D'AMARIO. Contacted the chambers spoke law clerk [redacted]xed copy of letter to us and then fax out letter to Debra, NJ USPO, and to [redacted] Also notified [redacted]

Pick-up letter from DUSM [redacted] D/MA while traveling to NJ to testify. Turned original to Debra.

Notified of second letter to Judge [redacted] chambers. Get a faxed copy and fax to Debra, USPO [redacted] USPO [redacted]nd [redacted] Spoke to Judge [redacted]n person about additional letters, also gave him copies.

 44

December 4, 2001

Received a call from [redacted] that D'AMARIO was convicted in NJ and remanded. Notified Chief, who called [redacted]. Also called USMS RI and Threat [redacted]. Called Chief in [redacted] THANKED him. Also spoke with [redacted] in AZ. [redacted] will no longer be covering D'AMARIO. D'AMARIO will be reporting to USPO [redacted]

b7C b7C b7C b7E, b2 b7C

December 5, 2001

Called and spoke to [redacted] and had him fed-ex the second letter to this office. Called and spoke to [redacted] USPO/RI re: conditions. According to [redacted] AZ. Closed out case and if D'AMARIO is acquitted on Rule 29 on Monday December 10. He will be able to return to RI. b7C

Called [redacted] in NJ re: Rule 29 Motion, left message [redacted] called back, briefed as to what would happen if D'AMARIO is acquitted on Monday. b7C

Called and spoke to [redacted] DUSM Camden, NJ [redacted] D'AMARIO is being housed at FDC Philly now. Rule 29 is set for Monday. Requested that [redacted] contact this office after hearing as to status. b7C

December 6, 2001

Received letter by fed-ex from 1st circuit court of appeals in Boston.

2/26/02 - SPOKE W/ AUSA GOLDBLANG. D'AMARIO JUST HAD BAIL HEARING AND WAS RELEASED ON BAIL TO SELF REPORT TO ARIZONA AND RESUME ELECTRONIC [redacted] MONITORING. I CONTACTED JUDGE [redacted] AND INFORMED HIM, [redacted] CONTACTED USPO [redacted] AND GAVE HEADS UP. b7C b7E b7C

148

45

UNITED STATES COURTS FOR THE FIRST CIRCUIT
OFFICE OF THE CIRCUIT EXECUTIVE
JOHN JOSEPH MOAKLEY UNITED STATES COURTHOUSE
1 COURTHOUSE WAY - SUITE 3700
BOSTON, MA 02210

GARY H. WENTE
CIRCUIT EXECUTIVE
617-748-9613

FLORENCE PAGANO
ASSISTANT CIRCUIT EXECUTIVE
617-748-9376

March 6, 2003

Arthur D'Amario, III
1488 W. Camino de la Oca
Green Valley, AZ 85614

Dear Mr. D'Amario:

Your letter, dated February 11, 2003, has been referred to my attention. As I indicated to you in my letter, dated February 6, 2003, the Circuit Executive's misconduct files do not contain the letters that you have identified. Indeed, there is no record that this office ever received such letters. Consequently, this Circuit Executive Office staff have no knowledge as to how the letters you describe would have, as you allege, been obtained by any other party.

Sincerely,

Florence Pagano

UNITED STATES COURTS FOR THE FIRST CIRCUIT
OFFICE OF THE CIRCUIT EXECUTIVE
JOHN JOSEPH MOAKLEY UNITED STATES COURTHOUSE
1 COURTHOUSE WAY - SUITE 3700
BOSTON, MA 02210

GARY H. WENTE
CIRCUIT EXECUTIVE
617-748-9613

FLORENCE PAGANO
ASSISTANT CIRCUIT EXECUTIVE
617-748-9376

May 5, 2008

Arthur D'Amario, # 02989-070
FCI Englewood
9595 W. Quincy Ave.
Littleton, CO 80123

Dear Mr. D'Amario:

Your correspondence, dated April 1, 2008, has been forwarded to my attention. While your allegations are unclear, as indicated in my letter of March 6, 2003, the files maintained in this office pertaining to your complaints of judicial misconduct have not been disclosed. Nor do the apparent fax cover pages from the U.S. Marshal Service for the District of New Hampshire and the other documents enclosed with your letter provide any indication to the contrary. Please note, however, that Rule 23 of the Rules for Judicial-Conduct and Judicial-Disability Proceedings permits the disclosure of otherwise confidential information in certain circumstances.

Sincerely,

Florence Pagano